## In the United States District Court for the Southern District of New York

| | |
|---|---|
| **Nia Rudasill**, **Eileen Gillis, Michael Schlem**, and **Robert Vuoto**, individually and as representatives of a class similarly situated persons, on behalf of the **Swiss Re Group U.S. Employees' Savings Plan**, <br><br> *Plaintiffs,* <br><br> v. <br><br> **Swiss Re American Holding Corporation**, **the Board of Directors of the Swiss Re American Holding Corporation, Philip K. Ryan, Larry Zimpleman, the Swiss Re American Holding Corporation Employee Pension Plan Committee, Great-West Lifeco Inc., Great-West Lifeco U.S. LLC, Empower Annuity Insurance Company of America, Empower Retirement, LLC, Empower Trust Company, LLC**, and **Does No. 1-10**, whose names are currently unknown, <br><br> *Defendants.* | Case No. 1:25-cv-01403 <br><br> The Honorable Judge _____ <br><br> **Class Action Complaint** <br><br> **Jury Trial Demanded** |

## INTRODUCTION

1.     Plaintiffs, Nia Rudasill ("Rudasill"), Eileen Gillis ("Gillis"), Michael Schlem ("Schlem"), and Robert Vuoto ("Vuoto") (collectively, "Plaintiffs"), individually in their capacity as former participants of the Swiss Re Group U.S. Employees' Savings Plan ("Plan"), bring this action under 29 U.S.C. § 1132, on behalf of the Plan

1

and a class of similarly-situated participants, against Defendants, Swiss Re American Holding Corporation ("Swiss Re"), the Board of Directors of Swiss Re Corporation ("Board"), the Swiss Re Employee Pension Plan Committee ("Employee Pension Plan Committee"), Philip K. Ryan and Larry Zimpleman who are members of the Board ("Board Members") and Does No. 1-10 who are members of the Employee Pension Plan Committee or other fiduciaries of the Plan and whose names are currently unknown (collectively, "Swiss Re Defendants"), Great-West Lifeco Inc., Great-West Lifeco U.S. LLC, Empower Annuity Insurance Company of America ("EAICA"), Empower Plan Services, LLC ("Empower") and Empower Trust Company, LLC (collectively, "Empower Defendants"), (collectively, "Defendants") for breach of their fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., and related breaches of applicable law beginning six years prior to the date this action is filed and continuing to the date of judgment or such earlier date that the Court determines is appropriate and just (the "Class Period").

2.     Defined Contribution Plans, such as 401(k) plans, have become the primary form of retirement savings in the United States, and can be considered our country's de facto retirement system. The participants—not their employers—bear the risk of high fees and the underperformance of their investments. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For

example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[1]

3.      To protect plan participants, ERISA imposes a high standard upon fiduciaries responsible for managing 401(k) plans. Fiduciaries must act for the sole purposes of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering their plans. 29 U.S.C. § 1104(a)(1)(A)(i)-(ii). These duties are among the highest known to law and must be "made with an eye single to the interest of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n. 8 (2d Cir. 1982).

4.      Swiss Re Defendants maintain the Plan, and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services. Empower Defendants provide recordkeeping services to the plan and exercise discretion or control over the administration and management of the Plan and Plan assets. Defendants are fiduciaries under ERISA who owe a series of duties to the Plan and its participants and beneficiaries, including obligations to act for the exclusive benefit of participants, ensure that the investment options offered through the Plan are prudent and diverse, and ensure that Plan expenses are fair and reasonable.

5.      As of December 31, 2023, the Plan had more than four thousand participants with account balances and assets totaling approximately $1.45 billion,

---

[1] *A Look at 401(k) Plan Fees*, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

placing it in the top 0.1% of all defined contribution plans by plan size. Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services fees within the marketplace for administration of defined contribution plans and the investment of defined contribution assets. The marketplace for defined contribution retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

6.      The Swiss Re Defendants failed to adhere to ERISA's basic principles, using flawed methodologies that led to a poor outcome; they chose expensive, underperforming investment options instead of lower-cost and better alternatives, and by charging the Plaintiffs grossly excessive recordkeeping fees.

7.      Consequently, Swiss Re Defendants have breached their fiduciary duties to the Plan. As detailed below, Swiss Re Defendants: (1) allowed the Plan to pay excessive recordkeeping service fees; (2) failed to use accepted methodologies when selecting investments to be included in the Plan, included poor performing investments in the Plan, and failed to monitor the performance of the investments included within the Plan; (3) failed to use Plan assets located in the Plan's forfeiture account pursuant to the Plan document; and (4) failed to prudently monitor Empower's misuse of participant data and Empower's cross-selling activity.

8.      As Plan fiduciaries, Empower Defendants violated ERISA when they: (1) improperly used confidential Plan participant data for cross-selling activities; (2)

4

engaged in prohibited transactions; and (3) knowingly participated in the ERISA violations of Plan fiduciaries.

9.     To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this class action under Sections 404, 409 and 502 of ERISA, 29 U.S.C. §§ 1104, 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed class as the Court may deem appropriate and just under all of the circumstances.

**PARTIES**

**A.     Plaintiffs**

10.     Plaintiff Nia Rudasill ("Rudasill") is a former employee of Defendant Swiss Re and former participant in the Plan under 29 U.S.C. § 1002(7) and is a resident of Rego Park, NY. During the Class Period, Rudasill maintained an investment through the Plan and was subject to the imprudent decisions, excessive recordkeeping and administrative costs alleged below.

11.     Plaintiff Eileen Gillis ("Gillis") is a former employee of Defendant Swiss Re and former participant in the Plan under 29 U.S.C. § 1002(7) and is a resident of Gaylordsville, CT. During the Class Period, Gillis maintained an investment through the Plan and was subject to the imprudent decisions, excessive recordkeeping and administrative costs alleged below

12.     Plaintiff Michael Schlem ("Schlem") is a former employee of Defendant Swiss Re and former participant in the Plan under 29 U.S.C. § 1002(7) and is a

5

resident of Olathe, KS. During the Class Period, Schlem maintained an investment through the Plan and was subject to the imprudent decisions, excessive recordkeeping and administrative costs alleged below.

13.    Plaintiff Robert Vuoto ("Vuoto") is a former employee of Defendant Swiss Re and former participant in the Plan under 29 U.S.C. § 1002(7) and is a resident of Los Angeles, CA. During the Class Period, Vuoto maintained an investment through the Plan and was subject to the imprudent decisions, excessive recordkeeping and administrative costs alleged below.

14.    The Plaintiffs and Class members were Plan participants who invested in the Plan's imprudent investment options, discussed herein, during the Class Period.

**B.    Defendants**

>    ***i.    Swiss Re Defendants***

15.    Swiss Re American Holding Corporation ("Swiss Re" or "Plan Sponsor") is a foreign business corporation headquartered in Zurich, Switzerland with an office located at 1301 Avenue of the Americas, New York, New York 10019. Swiss Re describes itself as "one of the world's leading providers of reinsurance, insurance, and other forms of insurance-based risk transfer, working to make the world more resilient. The aim of the Swiss Re Group is to enable society to thrive and progress, creating new opportunities and solutions for its clients."

16.    The Board of Directors of Swiss Re Corporation ( the "Board" or "Plan Administrator"), consists of twelve individuals, including Philip K. Ryan and Larry

Zimpleman ("Board Members"). According to Swiss Re's 2023 Form 5500, the Plan is administered and controlled by the Board of Swiss Re and they are fiduciaries under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102. The Board appointed "authorized representatives" including the Employee Pension Plan Committee, as plan fiduciaries.

17.    The Board Members were/are fiduciaries of the Plan under ERISA pursuant to 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority to appoint and/or monitor the Employee Pension Plan Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

18.    Oversight for the administration and investment performance review of the Plan has been delegated to the Swiss Re Employee Pension Plan Committee ("Employee Pension Plan Committee"). Swiss Re's 2023 Form 5500 provides that the Employee Pension Plan Committee "determines the Plan's valuation policies utilizing information provided by the investment advisors and custodian," making them fiduciaries under ERISA pursuant to 29 U.S.C. § 1002(21)(A).

### ii.    *Empower Defendants*

19.    Great-West Lifeco Inc. is an international financial services holding company headquartered in Canada serving 40 million customers worldwide. Great-West Lifeco Inc. operates in the U.S. under the "Empower Brand".

20.    Great-West Lifeco U.S. LLC, is the wholly owned U.S. subsidiary of Great-West Lifeco Inc. Great-West Lifeco U.S. LLC is a Delaware limited liability

company; its headquarters and principal place of business is located in Greenwood Village, CO. Great-West Lifeco U.S. LLC is the parent company of the "Empower Brand".

21.     Empower Annuity Insurance Company of America ("EAICA"), is an indirect wholly owned subsidiary of Great-West Lifeco Inc. Headquartered in Greenwood Village, CO, EAICA oversees the second-largest U.S. retirement plan recordkeeper by total participants and serves all segments of the employer-sponsored retirement plan market. EAICA maintains an office in New York, located at 370 Lexington Ave, Suite 703 New York, NY 10017.

22.     Empower Retirement, LLC ("Empower" or the "Recordkeeper"), is a branch of the "Empower Brand" that falls under EAICA. It is a Delaware limited liability company with its headquarters in Greenwood Village, CO. At all relevant times during the Class Period, Empower was the recordkeeper for the Plan appointed by the Plan Sponsor. In providing recordkeeping and asset allocation services to the Plan, Empower was and is a party in interest under 29 U.S.C. § 1002(14)(B) whose services and compensation the Plan Sponsor had a duty to monitor. Moreover, to the extent it exercised discretion or control over the administration and management of the Plan and Plan assets, Empower also was a fiduciary under 29 U.S.C. § 1002(21)(A).

23.     Empower Trust Company, LLC, is a branch of the "Empower Brand" that falls under EAICA. It is a Colorado limited liability company with its headquarters in Greenwood Village, CO. At all relevant times during the Class

Period, Empower Trust Company, LLC was the trustee for the Plan appointed by the Plan Sponsor.

## JURISDICTION AND VENUE

24.    Plaintiffs seek relief on behalf of the Plan participants pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

25.    This Court has subject matter jurisdiction over this action pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1132(e), and 28 U.S.C. § 1391 because Swiss Re resides in this district as defined by 28 U.S.C. § 1391, the Plan was administered in this district, some of the breaches took place in this district and Empower Defendants maintain an office located in this district.

26.    Plaintiffs have standing to bring this action. Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary, or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan. As explained herein, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by this Court.

## CLASS ALLEGATIONS

27.    This action is brought as a class action by Plaintiffs on behalf of themselves and the following proposed class (the "Class"):

> All participants and beneficiaries in the Swiss Re Group U.S. Employees' Savings Plan (the "Plan") at any time on or after January 31, 2019 to the date of judgment or such other earlier date that the Court

> determines is appropriate and just (the "Class Period"), including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

28.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

29.     **Numerosity.** Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States. As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

30.     **Commonality.** There are numerous questions of fact and/or law that are common to Plaintiffs and all the members of the Class, including, but not limited to the following:

> a.  Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;
>
> b.  Whether Swiss Re Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the plan;

10

c. Whether Swiss Re Defendants breached their fiduciary duties under ERISA by failing to utilize a viable methodology when selecting and maintaining investment options within the Plan;

d. Whether Swiss Re Defendants breached their fiduciary duties under ERISA by failing to use Plan assets in accordance with the Plan document;

e. Whether Swiss Re Defendants breached their fiduciary duties under ERISA by failing to monitor the Plans Recordkeeper;

f. Whether Empower Defendants breached their fiduciary duties under ERISA by providing advice to Plan participants regarding rolling over their plan assets to an Empower ROTH IRA;

g. Whether Empower Defendants breached their fiduciary duties under ERISA by engaging in prohibited transactions;

h. Whether Empower Defendants knowingly participated in the ERISA violation(s) of a Plan fiduciary; and

i. Whether and what form of relief should be afforded to Plaintiffs and the Class.

31. **Typicality.** Plaintiffs, who are members of the Class, have claims that are typical of all of the members of the Class. Plaintiffs' claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the

Class. In addition, Plaintiffs seek relief for the Plan under the same remedial theories that are applicable as to all other members of the Class.

32. **Adequacy of Representation.** Plaintiffs will fairly and adequately represent the interests of the members of the Class. Plaintiffs have no conflicts of interest with or interests that are any different from the other members of the Class. Plaintiffs have retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

33. **Potential Risks and Effects of Separate Actions.** The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

34. **Predominance.** Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues. Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certifications.

35.     **Superiority.** A class action is superior to all other feasible alternatives for the resolution of this matter. The vast majority of, if not all, Class members are unaware of Defendants' breaches of fiduciary duties and prohibited transactions such that they will never bring suit individually. Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation. Finally, individual litigation of multiple cases would be highly inefficient, a gross waster of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

36.     **Manageability.** This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

37.     Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above. Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

38.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure. Moreover, treating this case as a class action is

superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

39.    Therefore, this action should be certified as a class action under Rule 23(a) and 23(b)(1) and/or 23(b)(3) of the Federal Rules of Civil Procedure.

## STATEMENT OF FACTS

### A.    ERISA Fiduciary Standards

40.    To effectuate ERISA's primary purpose of protecting the retirement security of plan participants, "Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive." *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993). ERISA's strict fiduciary standards of prudence and loyalty are derived from the common law of trusts and are "the highest known to the law." *Donovan*, 680 F.2d at 272 n.8 (emphasis added).

41.    At common law, fiduciary obligations attached only to the entity formally designated in the trust instrument. ERISA similarly requires a written plan document which identifies one or more "named fiduciaries" with authority to control and manage the operation and administration of the plan, which is usually the employer who sponsors the plan. However, ERISA takes a far more expansive approach than the common law, extending fiduciary status to those who undertake certain plan-related functions. Thus, "an individual or entity can still be found liable as a 'de facto' fiduciary if it lacks formal power to control or manage a plan yet exercises informally the requisite 'discretionary control' over plan management and

administration." *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1101-02 (9th Cir. 2004); *see Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993) ("The statute provides that not only the persons named as fiduciaries by a benefit plan, …, but also anyone else who exercises discretionary control or authority over the plan's management, administration, or assets,…, is an ERISA 'fiduciary.' "); *see also Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 366 (2d Cir. 2014) ("…a person is a de facto fiduciary under ERISA to the extent she, inter alia, (a) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, or (b) has any discretionary authority or discretionary responsibility in the administration of such plan.") (internal quotations omitted).

42.     ERISA's three-pronged functional "fiduciary" definition states that a person is a fiduciary with respect to a plan to the extent:

> "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,
>
> (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or
>
> (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

29 U.S.C. § 1002(21)(A). Courts have an "obligation to liberally construe fiduciary status under ERISA." *Dawson-Murdock v. Nat'l Counseling Grp., Inc.*, 931 F.3d 269, 278 (4th Cir. 2019). As discussed *infra*, Empower met this fiduciary definition by

rendering investment advice for a fee and otherwise exercising authority and control over plan management and administration.

43.    Swiss Re, the Board Members, and Employee Pension Plan Committee are either named fiduciaries, functional fiduciaries (by virtue of conduct such as hiring Empower and other plan service providers), or both.

44.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. Section 404(a) of ERISA, 29 U.S.C. § 1104(a), states, in relevant part, as follows:

> "[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and
>
>> (A) For the exclusive purpose of
>>
>>> (i) Providing benefits to participants and their beneficiaries; and
>>>
>>> (ii) Defraying reasonable expenses of administering the plan;
>>
>> (B) With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>>
>> (C) By diversifying the investments of the plan as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>>
>> (D) Act in accordance with the terms of the plan unless contrary to ERISA."

45.    ERISA fiduciaries are subject to an unyielding duty of loyalty. *See Pegram v. Herdrich*, 530 U.S. 211, 224–25 (2000). The statute states in relevant part that "a fiduciary shall discharge his duties with respect to a plan solely in the interest

of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Under ERISA, a fiduciary must act "with an eye single to the interests of the participants and beneficiaries." *Donovan*, 680 F.2d at 271 *citing* Restatement of Trusts 2d § 170 (1959), II Scott on Trusts § 170, at 1297–99 (1967), and Bogert, The Law of Trusts and Trustees § 543 (2d ed. 1978).

46.    In addition to a fiduciary's duty of loyalty, a fiduciary must act prudently. Under ERISA, a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). To fulfill this duty, the fiduciary must investigate and evaluate investments and exercise the sound judgment of a knowledgeable and impartial financial expert in making investment decisions or formulating investment advice. The duty of prudence extends to the selection of service providers, such as recordkeepers. *See Hughes v. Nw. Univ.*, 142 S. Ct. 737, 741 (2022).

47.    Because the content of the duty of prudence depends on the surrounding circumstances, the requisite level of care may vary based on the circumstances facing the fiduciary. The personal data of a plan's participants is highly sensitive and confidential. Fiduciaries, like the Defendants, are entrusted with sensitive participant data; therefore, they must exercise the highest care to ensure its safety and security.

48.     Objectively prudent fiduciaries select service providers who safeguard the personal data of plan participants, and take steps to ensure that recordkeepers maintain the integrity of participants' data, do not allow it to fall into the wrong hands or, worse, misuse it themselves. Thus, plan fiduciaries who fail to take steps to ensure that service providers protect and only use participant data for proper purposes, breach their fiduciary duties.

49.     Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in a plan and their beneficiaries and defraying reasonable expenses of administering the plan.

50.     A fiduciary also cannot turn a blind eye to the breach of its co-fiduciary. In addition to any liability a fiduciary may have for its own breach, a fiduciary can also be liable for knowingly participating in, concealing, or failing to remedy a co-fiduciary's breach of duty. See 29 U.S.C. § 1105(a). ERISA states, in relevant part, as follows:

> "In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1) If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
> >
> > (2) If, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3) If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

29 U.S. Code § 1105(a).

51.     To supplement the general fiduciary duty of loyalty, Congress prohibits per se certain transactions deemed likely to injure a plan, including self-dealing transactions and transactions with "parties in interest," defined to include "those entities that a fiduciary may be inclined to favor at the expense of the plan beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241-42 (2000); 29 U.S.C. § 1106(a)-(b). An entity providing services to a plan is a party in interest. 29 U.S.C. § 1002(9), (14)(B). While certain otherwise prohibited transactions may be eligible for an exemption, the necessary conditions for relief generally require the fiduciary to show that the transaction serves the participants' interests rather than the fiduciary's or service provider's interests and involves no more than reasonable compensation.

52.     29 U.S.C. § 1106(a)(1) provides:

> "(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> > (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
> >
> > (B) lending of money or other extension of credit between the plan and a party in interest;
> >
> > (C) furnishing of goods, services, or facilities between the plan and a party in interest;
> >
> > (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

> (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title."

53.    29 U.S.C. § 1106(b) states:

> "A fiduciary with respect to a plan shall not—
>
> (1) deal with the assets of the plan in his own interest or for his own account,
>
> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
>
> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

54.    Section 502(a)(2) of ERISA, 29 U.S.C § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under Section 409, 29 U.S.C. § 1109. Section 409(a) of ERISA provides, in relevant part:

> "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

55.    Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), also authorizes a plan participant to bring a civil action against a non-fiduciary for its knowing participation

in a breach of the fiduciary duties set forth in Section 404 of ERISA. *See Carfora v. Teachers Ins. Annuity Assn. of Am.*, 21 CIV. 8384 (KPF), 2024 WL 2815980, at *5 (SDNY May 31, 2024) ("By authorizing suits 'to enjoin any actor or practice, which violates [ERISA],' Section 502(a)(3) extends liability for ERISA violations to certain non-fiduciaries, including for a non-fiduciary's knowing participation in a breach of the fiduciary duties set forth in Section 404."). Section 502(a)(3) of ERISA provides, in relevant part:

> "A civil action may be brought… by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

## B.    Defined Contribution Plans

56.    Many employers offer their employees an employer sponsored retirement plan. Today, "[d]efined contribution plans dominate the retirement plan scene." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). Plaintiffs and the Class members are participants in defined contribution plans.

57.    In a defined contribution plan, participants contribute earnings[2] (often matched by the employer up to a certain percentage) into an individual account and direct the contributions into one or more options on the plan's investment menu, which is assembled by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined

---

[2] Pre-tax and after tax contributions are permitted by law. In the Plan before the Court, all participant contributions are pre-tax.

by the market performance of employee and employer contributions, less expenses."
*Tibble*, 575 U.S. at 525.

58.    In contrast to an individual seeking to make a small investment in the retail market at retail prices, a defined contribution plan pools the purchasing power of the combined assets of all of the plan's participants—often thousands of individuals. Thus, large employer sponsored defined contribution plans have the ability to obtain much lower fees than an individual would be able to obtain in the retail market. Those lower fees produce enhanced retirement savings.

59.    The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble* at 525.

60.    A plan's fiduciaries have control over defined contribution plan expenses. The fiduciaries are responsible for hiring administrative service providers for a plan, such as a recordkeeper, and for negotiating and approving the amount of fees paid to those administrative service providers. The fiduciaries also have exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each have their own fees, which are deducted from the returns participants receive on their investments.

61.    These fiduciary decisions have the potential to dramatically affect the amount of money participants are able to save for retirement. The Department of

Labor has illustrated that a 1% difference in fees reduces the average worker's account balance by 28% after 35 years.[3] Assuming an account balance of $100,000 with an 8% annual return, such fee differential adds up to over $400,000 after 40 years.[4] Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for billion dollar plans like the Plan, which have the bargaining power to obtain the highest level of service at the lowest fees. The fees available to billion dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors and small plans.

62.    Plan participants typically have little understanding of the fees being assessed to their accounts. Indeed, according to a 2017 survey conducted by TD Ameritrade, only 27% of investors believed they knew how much they were paying in fees as participants in defined contribution plans, and 37% were unaware that they paid defined contribution fees at all.[5] It is incumbent upon plan fiduciaries to act for the exclusive best interest of plan participants. This includes protecting the participants' retirement dollars and ensuring that fees are fully disclosed and remain reasonable for the services provided.

---

[3] *A Look at 401(k) Plan Fees*, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

[4] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees*, PLANSPONSOR (May 15, 2020), https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/ (accessed Jan. 15, 2025).

[5] *See* https://www.usicg.com/siteassets/documents/compliance-calendar/what_you_dont_know_about_401k_fees.pdf?v=4a8175 (accessed Jan. 15, 2025).

63.    The entities that provide services to defined contribution plans have an incentive to maximize their fees by marketing their own products to participants and collecting the highest amount possible for recordkeeping. For each dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for assets used to overpay a service provider to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, and reduce the plan's fees.

64.    Fiduciaries must be cognizant of providers' self-interest in maximizing fees. In order to act in the exclusive interest of plan participants, fiduciaries must negotiate as if their own money is at stake.

65.    Failures by ERISA fiduciaries to monitor fees and costs for reasonableness, such as those identified herein, have stark financial consequences for retirees. Every extra expense imposed upon plan participants compounds over time, reducing the value of participants' investments available upon retirement. Over time, even small differences in fees result in vast differences in the amount of savings available to participants at retirement.

## C.    Recordkeeping and Administrative Fees

66.    Most fiduciaries of large defined contribution plans, including the Plan, hire a single provider to provide recordkeeping and administrative services for the plan. The recordkeeper keeps track of the amount of each participant's investments and provides each participant with account statements. The recordkeeper

customarily maintains a plan website or call center that participants can access to review their accounts and obtain information about the plan. These services are largely commodities, and the market for recordkeeping services is highly competitive.

67.    The term "recordkeeping" is a catchall term for the entire suite of recordkeeping and administrative services typically provided by a plan's service provider or "recordkeeper".

68.    There are numerous recordkeepers in the marketplace who are capable of providing a high level of service and who will vigorously compete to win a recordkeeping contract for a large defined contribution plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (e.g., recordkeeping, website, call center, etc.).

69.    Some recordkeepers only provide recordkeeping and administrative services, while others provide both recordkeeping services and investment products. The latter group has an incentive to market their own proprietary products to maximize revenues from servicing the plan.

70.    There are two primary ways defined contribution plans pay for recordkeeping and administrative services: (1) "direct" payments from plan assets; or (2) "indirect" revenue sharing payments from plan investments. Plans may use one method or the other exclusively, or may use a combination of both direct and indirect payments.

71.    In a typical direct payment arrangement, the fiduciary contracts with the recordkeeper to obtain administrative services in exchange for a flat annual fee

based on the number of participants for which the recordkeeper will be providing services, for example $30 per participant. Direct compensation is paid directly from plan assets and is reflected as a deduction in the value of participant accounts.

72.    A recordkeeper's cost for providing services depends on the number of participants in the plan, not the amount of assets in the plan or in an individual account. The cost of recordkeeping a $75,000 account balance is the same as a $7,500 account. Accordingly, a flat price based on the number of participants in the plan ensures that the amount of compensation is tied to the actual services provided and does not grow based on matters that have nothing to do with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

73.    Indirect compensation is paid to the recordkeeper indirectly through investment options and is deducted from the investment (most often from the investment's expense ratio in the form of so-called "revenue sharing" payments that are collected by the investment provider and then remitted to the recordkeeper). Thus, in most cases, participants may find it difficult to calculate these fees. Revenue sharing, while not a *per se* violation of ERISA, can lead to excessive fees if not properly monitored or capped.

74.    In a revenue sharing arrangement, the fund pays the plan's recordkeeper putatively for providing recordkeeping and administrative services for the fund. However, because revenue sharing payments are asset based, the fees can

grow rapidly if plan assets grow although the number of participants and services provided do not.

75.    Fiduciaries using revenue sharing to pay for recordkeeping are required to (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, and (3) control the amount of fees paid through recordkeeping by obtaining rebates of any revenue sharing amounts that exceed the reasonable level of fees.

76.    Virtually all recordkeepers are subsidiaries or affiliates of financial services and insurance companies that also provide investment options to defined contribution plans (e.g., mutual funds, insurance products, collective trusts, separate accounts, etc.), or have some other ancillary line of business (e.g., consulting) to sell to plans. Discounts in the recordkeeping service fee are often available based on revenues the recordkeeper earns through the provision of other services (e.g., investment management revenues). In many cases, the additional investment management revenues are more than double or triple the revenue earned by the recordkeeper for providing recordkeeping services.

77.    For large plans with greater than 4,000 participants, any minor variations in the way that these recordkeeping services are delivered have no material impact on the fees charged by recordkeepers to deliver the services. This fact is confirmed by the practice of recordkeepers quoting fees for bundled recordkeeping services on a per-participant basis without regard for any individual differences in

services requested. These individual differences are treated as immaterial because they are inconsequential to recordkeepers from a cost perspective.

78.     Due to the economies of scale that are part of a recordkeeping relationship, and because the incremental variable costs for providing recordkeeping services are dependent on the number of participants with account balances in a defined contribution plan, the cost to the recordkeeper on a per-participant basis declines as the number of plan participants increases and, as a result, recordkeepers will accept a lower per participant fee to provide recordkeeping services as the number of participants in the plan increases.

79.     As a result, it is axiomatic in the retirement plan services industry that an employer sponsor of a large retirement plan applying a viable methodology will (1) negotiate a lower effective per-participant fee when evaluated on a per-participant basis; and (2) ensure that the effective per-participant recordkeeping service fee decreases as the participant count and plan assets under management increase.

80.     The average cost to a recordkeeper of providing services to a participant similarly does not hinge on that participant's account balance. In other words, it costs a recordkeeper the same amount to provide services to a participant with an account balance of $10,000 as it does to provide services to a participant with a balance of $1,000,000.[6]

---

[6] Evolving Best Practices: Recordkeeping Fees, PLANSPONSOR (Nov. 1, 2019) https://www.plansponsor.com/evolving-best-practices-recordkeeping-fees/ (accessed Feb. 7, 2025)

81.     A plan fiduciary acts with prudence and loyalty when its methodology is viable to produce outcomes in the sole interest of its participants. As such, prudent plan fiduciaries are aware of these cost structure dynamics. Understanding these marketplace realities and facts, prudent fiduciaries of large plans (like the Plan) will leverage the plan's participant count to obtain lower effective per-participant fees. *See infra* ¶133.

82.     Prudent fiduciaries evaluate the fees for recordkeeping services on a dollar-per-participant basis. This is the current standard of care for ERISA fiduciaries and has been throughout the Class Period.

83.     Prudent fiduciaries will regularly ensure that a plan is paying fees commensurate with its size in the marketplace by soliciting competitive bids from recordkeepers other than the plan's current provider. Recognizing that recordkeeping services are uniform in nature, and that any minor differences in the services required by a large plan are immaterial to the cost of providing such services, most recordkeepers only require a plan's participant count and asset level in order to provide a fee quote. These quotes may be provided on a per-participant basis, enabling fiduciaries to easily compare quotes to determine if the current level of fees being charged by a plan's recordkeeper is reasonable.

## D.     Modern Portfolio Theory and Investment Selection

84.     ERISA fiduciaries must develop a method for selecting and reviewing the investments for a defined contribution plan. For a fiduciary, like Swiss Re or the Board, making independent investigations about the merits of investments is at the

heart of the prudent person standard. *Fink v. National Savings and Trust Company*, 772 F.2d 951, 957, 6 E.B.C. 2269 (DC Cir. 1985).

85.    Although no specific methodology is opined in ERISA, a fiduciary develops one and comes to conclusions based on the relativity of the data, its likelihoods, against the respective universe of investments available at the time. In addition, since a fiduciary takes on the highest form of trust and duty, an asset beneficiary should expect one to have a very high level of subject matter expertise.

86.    The tools of Modern Portfolio Theory provide insight into the risk, return, and volatility aspects of investment options. This allow fiduciaries to investigate how their investment options stand-alone against their respective benchmarks and alternative investments in the same category. The Uniform Prudent Investment Act validates Modern Portfolio Theory in a prefatory note:

> (UPIA) undertakes to update trust investment law in recognition of the alterations that have occurred in investment practice. These changes have occurred under the influence of a large and broadly accepted body of empirical and theoretical knowledge about the behavior of capital markets, often described as "modern portfolio theory."

87.    When a fiduciary relationship is established and prudence must be exercised, a fiduciary will analyze various data points to assess the likelihood chosen investments options are in sole interest of the plan participants. These data points include, but are not limited to, the following:

- Sensitivity to market movements.[7]

---

[7] Beta: https://www.morningstar.com/InvGlossary/beta.aspx (accessed Feb. 18, 2025).

- Statistical measurement of dispersion about an average, depicting how widely a mutual fund's returns varied over a certain period of time. When an investment has a high standard deviation, the predicted range of performance is wide, implying greater volatility.[8]

- Correlation of an investment's returns to its benchmark's returns.[9]

- Standard deviation and excess return to determine reward/return per unit of risk, historical risk-adjusted performance.[10]

- Returns in excess of benchmark returns to the volatility of those returns. Measuring an investment manager's ability to generate excess returns relative to a benchmark and attempting to identify the consistency of the investment manager.[11]

88.    When researching possible investments to include in a plan and their respective competitors, Morningstar is the primary investment research tool used throughout the investment management industry.[12] It is considered the most accepted source of information, with regards to defined contribution plan assets, as it maintains the most robust information on Mutual Funds, Collective Investment Trusts (CITs), Separately Managed Accounts, and Annuity Sub-accounts.

89.    Morningstar allows fiduciaries to use the "Investor Screener" to narrow down investment options by investment type, such as ETFs, Mutual Funds or

---

[8] Standard Deviation: https://www.morningstar.com/investing-definitions/standard-deviation (accessed Feb. 18, 2025).

[9] R squared: https://www.morningstar.ca/ca/news/187605/the-morningstar-dictionary-r-squared.aspx (accessed Feb. 18, 2025).

[10] Sharpe Ratio: https://www.morningstar.com/investing-definitions/sharpe-ratio (accessed Feb. 18, 2025).

[11] Information Ratio: https://admainnew.morningstar.com/webhelp/glossary_definitions/mutual_fund/Information_Ratio.htm (accessed Feb. 18, 2025).

[12] See https://www.forbes.com/advisor/investing/morningstar-review/ (accessed Feb. 18, 2025); https://www.modestmoney.com/what-is-morningstar/ (accessed Feb. 18, 2025).

Stocks.[13] Once the investment type has been selected, fiduciaries can then use Morningstar's "search levers" to filter through a variety of investment options based on the desired investment parameters.[14] In using Morningstar's "search levers," fiduciaries can isolate a list of investment options based the "Morningstar Rating for Funds"—often called the "star rating"—which is a data driven rating that measures how well an investment has performed compared to similar investments.[15] To determine an investment's "star rating", Morningstar groups investments into categories based on kinds of investments they hold, allowing an "apples-to-apples comparison."[16] Investments located in a specific Morningstar "category" have similar risk, return, and behavior profiles ("Morningstar Category").[17]

90.    Once a fiduciary has narrowed down the list of possible investments based on the star rating and category, they may add additional search parameters like the highest 3 and 5-Year month-end annualized returns, year-end annualized returns,[18] and the 3 and 5-year month-end category ranking while keeping an eye on

---

[13] *See How to use the Screener in Morningstar Investor*, MORNINGSTAR (May 21, 2024) https://community.morningstar.com/s/article/investor-screener (accessed Jan. 17, 2025); *Using the Screener,* MORNINGSTAR (Aug. 19, 2022) https://workstation.morningstar.com/support/article/blt36c156b428041ae8/UsingtheScreener (accessed Feb. 7, 2025); *Morningstar Advisor Workstation Training Guide, Creating Searches in Morningstar Advisor Workstation* (July 2017) https://advisor.morningstar.com/Enterprise/VTC/Searches.pdf (accessed Feb. 7, 2025).
[14] *Id.*; *Find Similar Funds*, MORNINGSTAR OFFICE (2023) https://awgmain.morningstar.com/webhelp/tools/Find_Similar_Funds.htm (accessed Jan. 17, 2025).
[15] *Morningstar's Fund Ratings,* MORNINGSTAR https://www.morningstar.com/help-center/funds/fund-ratings (accessed Jan. 22, 2025); *Morningstar Rating for Funds*, MORNINGSTAR https://player.vimeo.com/video/159246835 (accessed Jan. 22, 2025).
[16] *Morningstar Rating for Funds*, MORNINGSTAR https://player.vimeo.com/video/159246835 (accessed Jan. 22, 2025).
[17] *What is a Morningstar Category*, MORNINGSTAR (Aug. 12, 2021) https://www.morningstar.com/investing-definitions/category (accessed Jan. 17, 2025).
[18]*See* https://www.morningstar.co.uk/uk/tools/categoryoverview.aspx (accessed Feb. 7, 2025).

the total assets of each investment on the list that is produced. In addition, Morningstar offers 1 year and 10 year "since inception" statistics. The following are year-end annualized returns[19] looking back from 2023-2013:

| Investment | 1YR | 3 YR | 5 YR | 10 YR |
|---|---|---|---|---|
| JPM Smart Ret 2030 R5 (JSMIX)[20] | 15.53% | 2.22% | 7.74% | 6.05% |
| Trowe Ret I  2030 I (TRPCX 9/29/15) | 16.54% | 3.29% | 9.40% | N/A |
| Trowe Ret 2030 C CIT (8/23/13) | 16.58% | 3.27% | 9.46% | 7.34% |
| TRP Ret HY 2030 T4 CIT | 16.86% | 3.82% | 9.82% | 7.52% |
| Am 2030 Trgt Ret R6 (RFETX 7/13/09) | 14.52% | 3.47% | 8.90% | 7.25% |
| Mutual of America 2030 (MURIX 11/5/07) | 15.25% | 4.49% | 9.20% | 7.27% |
| MM Sel TRP Ret 2030 I (MMTRX) | 16.55% | 3.18% | 9.38% | N/A |
| Callan GP 2030 R6 CIT (4/28/08) | 14.41% | 4.85% | 9.91% | 7.50% |
| TC/Nuveen Life Ind 2030 R6 (TLHIX 9/30/09) | 15.55% | 2.84% | 8.65% | 6.80% |

| Investment | 1YR | 3 YR | 5 YR | 10 YR |
|---|---|---|---|---|
| JPM Smart Ret 2040 R5 (SMTIX) | 18.93% | 4.23% | 10.09% | 7.29% |
| Trowe Ret I  2040 I (TRPDX) | 19.80% | 4.32% | 10.86% | N/A |
| Trowe Ret 2040 C CIT | 19.96% | 4.39% | 10.98% | 8.25% |
| Trowe Ret HY 2040 T4 CIT 01/05/09) | 20.23% | 5.25% | 11.46% | 8.49% |
| Am 2040 Trgt Ret R6 (RFGTX) | 19.33% | 4.75% | 11.17% | 8.57% |
| Mutual of America 2040 (MURLX) | 18.87% | 6.45% | 11.19% | 8.17% |

---

[19] The annualized returns are considered after cost returns, which means the expense ratio of each fund has been factored in.

[20] "JPM Smart Ret [Year] R5" is the Plan's default investment option for Plan participants who do not make an active investment choice, known as the Plan's Qualified Default Investment Alternative ("QDIA").

| | | | | |
|---|---|---|---|---|
| **MM Sel TRP Ret 2040 I (MMFOX)** | 19.85% | 4.26% | 10.84% | N/A |
| **Callan GP 2040 R6 CIT (4/28/08)** | 16.75% | 5.61% | 11.02% | 7.97% |
| **TC/Nuveen Life Ind 2040 R6 (TLZIX 9/30/09)** | 18.98% | 4.43% | 10.51% | 7.95% |

| Investment | 1YR | 3 YR | 5 YR | 10 YR |
|---|---|---|---|---|
| **JPM Smart Ret 2050 R5 (JTSIX)** | 20.32% | 4.92% | 10.74% | 7.59% |
| **Trowe Ret I 2050 I (TRPMX)** | 20.92% | 4.77% | 11.38% | N/A |
| **Trowe Ret 2050 C CIT** | 21.17% | 4.93% | 11.54% | 8.53% |
| **Trowe Ret HY 2050 T4 CIT 01/06/09)** | 21.39% | 5.80% | 12.01% | 8.75% |
| **Am 2050 Trgt Ret R6 (RFITX)** | 20.83% | 4.75% | 11.40% | 8.76% |
| **Mutual of America 2050 (MURNX)** | 19.94% | 6.92% | 11.55% | 8.24% |
| **MM Sel TRP Ret 2050 I (MMDDX)** | 20.99% | 4.73% | 11.38% | N/A |
| **Callan GP 2050 R6 CIT (4/28/08)** | 18.04% | 5.75% | 10.83% | 8.1 |
| **TC/Nuveen Life Ind 2050 R6 (TLLIX 9/30/09)** | 20.54% | 5.22% | 11.46% | 8.48% |

91.    As utilizing either the 3 and/or 5-year search parameter is a widely accepted starting point for narrowing down investment options, fiduciaries will further investigate each investment option by looking at the investments 3/5-year risk/return statistics. The risk/return statistics show the volatility of an investments over time and helps fiduciaries assess how much additional return an investment is producing, per unit of risk. These numbers are assessed against the average risk/return statistics of: (1) investments in the same category; (2) the relevant

benchmark;[21] and (3) investments available at the time the investment options are assessed. The following are 3/5-year risk/return statistics for the first quarter of 2024:

| Investment | S/D (3/5) | S/R (3/5) | I/R (3/5) |
|---|---|---|---|
| JPM Smart Ret 2030 R5 (JSMIX) | 12.44/12.93 | 0.01/0.35 | -0.67/-0.43 |
| Trowe Ret I 2030 I (TRPCX) | 12.93/14.12 | 0.05/0.43 | -0.21/0.45 |
| Trowe Ret 2030 C CIT | 12.97/14.14 | 0.07/0.45 | -0.08/0.55 |
| Trowe Ret HY 2030 T4 CIT (01/05/09) | 13.07/14.20 | 0.10/0.47 | 0.18/0.73 |
| Am 2030 Trgt Ret R6 (RFETX) | 12.06/12.25 | 0.09/0.48 | 0.15/0.48 |
| Mutual of America CP 2030 (MURIX) | 12.37/13.28 | 0.14/0.45 | 0.59/0.60 |
| MMutual Sel TRP Ret 2030 I (MMTRX) | 13.02/14.14 | 0.06/0.44 | -0.14/0.52 |
| Callan GP 2030 R6 CIT (4/28/08) | 12.62/13.71 | 0.15/0.49 | 0.64/0.89 |
| TC/Nuveen Life Ind 2030 R6 (TLHIX 9/30/09) | 12.53/12.84 | 0.05/0.43 | -0.30/0.24 |

| Investment | S/D (3/5) | S/R (3/5) | I/R (3/5) |
|---|---|---|---|
| JPM Smart Ret 2040 R5 (SMTIX) | 14.82/15.94 | 0.13/0.44 | -0.36/0.01 |
| Trowe Ret I 2040 I (TRPDX) | 15.24/16.29 | 0.12/0.47 | -0.41/0.35 |
| Trowe Ret 2040 C CIT | 15.25/16.28 | 0.14/0.49 | -0.24/0.50 |
| Trowe Ret HY 2040 T4 CIT 01/05/09) | 15.36/16.46 | 0.19/0.51 | 0.20/0.80 |
| Am 2040 Trgt Ret R6 (RFGTX) | 14.83/15.46 | 0.19/0.53 | 0.21/0.69 |
| Mutual of America 2040 (MURLX) | 14.94/13.28 | 0.24/0.45 | 0.74/0.60 |
| MM Sel TRP Ret 2040 I (MMFOX) | 15.36/16.37 | 0.14/0.48 | -0.30/0.43 |
| Callan GP 2040 R6 CIT (4/28/08) | 14.39/15.75 | 0.20/0.50 | 0.22/0.66 |

---

[21] https://www.morningstar.co.uk/uk/glossary/98017/benchmark.aspx ("An index against which a fund measures its performance. Funds typically compare their performance against indices such as the FTSE 100 or the S&P 500.") (accessed Feb. 7, 2025).

| TC/Nuveen Life Ind 2040 R6 (TLZIX 9/30/09) | 14.67/15.37 | 0.16/0.48 | -0.16/0.22 |
|---|---|---|---|

| Investment | S/D (3/5) | S/R (3/5) | I/R (3/5) |
|---|---|---|---|
| JPM Smart Ret 2050 R5 (JTSIX) | 15.83/17.02 | 0.18/0.46 | -0.30/0.00 |
| Trowe Ret I 2050 I (TRPMX) | 15.93/16.98 | 0.16/0.49 | -0.47/0.27 |
| Trowe Ret 2050 C CIT | 15.95/16.99 | 0.18/0.51 | -0.30/0.44 |
| Trowe Ret HY 2050 T4 CIT (01/06/09) | 16.05/17.21 | 0.22/0.52 | 0.13/0.74 |
| Am 2050 Trgt Ret R6 (RFITX) | 15.55/16.14 | 0.19/0.53 | -0.19/0.31 |
| Mutual of America CP 2050 (MURNX) | 15.81/17.06 | 0.26/0.50 | 0.53/0.44 |
| MM Sel TRP Ret 2050 I (MMDDX) | 16.05/17.06 | 0.17/0.49 | -0.39/0.33 |
| Callan GP 2050 R6 CIT (4/28/08) | 15.15/16.47 | 0.21/0.50 | -0.15/0.36 |
| TC/Nuveen Life Ind 2050 R6 (TLLIX 9/30/09) | 15.83/16.76 | 0.20/0.50 | -0.11/0.38 |

92.    While no one can predict exactly which investments will out-perform other investments or which decision is the best, prudence requirements may be met by examining investments for appropriate factors such as the risk of loss, the opportunity for return, diversification, liquidity, current return and projected return. DOL guidance states that appropriate consideration or alternatively, procedural due diligence, means ensuring investment decisions are reasonable, and applicable to the plan's design:

> "Appropriate consideration shall include, but is not necessarily limited to, (i) A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the

> purposes of the plan, taking into consideration the
> risk of loss and the opportunity for gain (or other
> return) associated with the investment or
> investment course of action."

29 C.F.R. § 2550.404a-1.

93.    When considering investment options, another important factor is the share class offered for each investment included in the plan. Shares of a single mutual fund may be offered in different "classes" (for example: retail v. institutional) which correspond to different shareholder rights and costs, such as different fee and "load" (*i.e.*, sales) charges. All share classes of mutual funds charge fees for the management of the assets of the fund. Indeed, a single mutual fund may have multiple share classes with different levels of advisory or shareholder services, resulting in different expense ratios and different revenue sharing for the various share classes.

94.    Importantly, while the costs for the different share classes of the same investment may differ, the composition of the investments are identical.

95.    The two most common types of mutual funds are retail funds and institutional funds. Retail class shares – such as class A, B, and C shares – are available to a broad spectrum of investors, including individuals, while institutional class shares are typically only sold to larger investors. Some share classes are specifically designed for employer-sponsored retirement plans. These are known as R Shares and range from R1 to R6. Class R6 shares are a no-load class that offers shares with a fee structure that does not include 12b-1 fees. A 12b-1 fee is a marketing and distribution fee for a mutual fund that is included in a fund's expense ratio.[22]

---

[22] https://www.morningstar.com/investing-definitions/12b-1-fee (accessed Feb. 18, 2025).

Therefore, class R6 shares often carry a lower expense ratio than other class R class shares. R6 funds are readily accessible to plans with assets ranging from $10 million to more than $250 million.

96.    The expense ratio associated with the class of shares offered in a plan is significant because it determines the percentage of fund assets deducted each fiscal year for fund costs and it reduces both the returns and compounding returns that plan participants receive. This fee encompasses various operational expenses, including, investment management fees, administrative costs, and distribution and service fees (12b-1 fees). Under ERISA, higher expense ratios must be justified by corresponding benefits to plan participants.[23]

97.    The expense ratio directly impacts investment returns as these fees are automatically deducted from the fund's assets on an ongoing basis. For example, if a plan participant invests $10,000 in a fund whose class of shares has a 1% expense ratio ($10 per $1,000 invested) and the fund yields a 10% return rate, the participant only receives $10,900; however, if the same investment is made in the same fund whose class of shares has a .5% expense ratio ($5 per $1,000 invested) at the same rate of return, the participant will receive $10,950.

98.    While an initial difference of $50 may seem small, over time, these small differences in expense ratios can significantly impact retirement savings due to the

---

[23] *See* https://www.klgates.com/ERISA-Fiduciary-Issues-for-Plan-Sponsors-What-Do-401k-Plan-Fiduciaries-Need-to-Know-About-Revenue-Sharing-10-31-2016 (accessed Feb. 18, 2025); U.S. Department of Labor Advisory Opinion 2013-03A (July 3, 2013) https://www.dol.gov/sites/dolgov/files/ebsa/pdf_files/2013-03a.pdf (accessed Feb. 7, 2025).

compounding effect of these recurring charges. Utilizing the same annual investment ($10,000) and rate of return (10%), over the course of 10 years, this $50 difference becomes a difference of $4,782.25 in the participants account; and over 30 years, equates to a difference of $153,325.98 in savings. Therefore, a plan fiduciary's decision as to what class of share to offer plan participants can result in a significant loss to participants and decrease the likelihood that plan participants will reach their desired lifestyle in retirement.

99.    Fiduciary duties do not end at the selection process. There is a continuing duty to monitor investments or service providers after the selection process. *Tibble*, 575 U.S. at 529 ("This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting…at the outset").

100.    Details about a fiduciary's methods and actual knowledge regarding investment decisions tend to be in the fiduciary's sole possession. *See Carfora v. Tchrs. Ins. Annuity Ass'n of Am.,* No. 21 CIV. 8384 (KPF), 2024 WL 2815980, at *4 (S.D.N.Y. May 31, 2024); *Sacerdote v. New York University*, 7 F.4th 95, 107 (2d Cir. 2021) ("[W]e are cognizant that 'ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.' "); *St. Vincent Catholic Medical Centers Retirement Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719-720 (2d Cir. 2013); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("No matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences"). ERISA imposes disclosure

requirements on plan administrators, which are supposed to give plan beneficiaries "the opportunity to find out how the fiduciary invested the plan's assets." *St. Vincent,* 712 F.3d at 720.

101.    The reality is that plan participants cannot rely on most of the required disclosures to determine whether a fiduciary has acted in accordance with its duty, which is one of the highest standards known to law. *Donovan*, 680 F2d at 271. Below are the documents relevant to this matter that must be disclosed:[24]

- *Summary Plan Description (SPD)* – Informs participants of their rights, benefits, and obligations under the plan.

- *Summary of Material Modification (SMM)* – Describes any material modification to a plan and to the information required in the plan's SPD.

- *Summary Annual Report (SAR)* – Provides a "narrative summary" of the plan's annual Form 5500.

- *Notification of Benefit Determination* – Provides information regarding determinations of any benefit claim made by the participant.

- *Plan Document* – Upon request, the plan administrator must make the Plan available to the participant.

- *Notice of Blackout Period for Individual Account Plans* – Notice that a participant's account is temporarily suspended, limited, or restricted under an individual account plan.

- *Qualified Default Investment Alternative Notice* – Provides advance notice describing how contributions will be invested on the participant's behalf if no investment is otherwise selected.

---

[24] *Reporting and Disclosure Guide for Employee Benefit Plans*, U.S. DEPT. OF LABOR (Sept. 2017), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/reporting-and-disclosure-guide-for-employee-benefit-plans.pdf (accessed Jan. 16, 2025); *Retirement Plans Reporting and Disclosure Requirements*, INTERNAL REVENUE SERVICE (July 2020), https://www.irs.gov/pub/irs-pdf/p5411.pdf (accessed Jan. 16, 2025).

- *Automatic Contribution Notice* – Informs participants of their rights and obligations related to an automatic contribution arrangement.

- *Annual Funding Notice* – Contains "basic information" about the status and financial condition of the plan.

- *Participant Plan and Investment Fee Disclosures* (for self-directed plans) – inapplicable to individuals invested in the QDIA.

- *Form 5500* – Provides aggregate information on a plan's qualification, financial condition, and operation.

- *Form 5588* – Application for extension of time to file Form 5500.

- *Form 1099-R* – Reports participant distributions of $10 or more.

- *Notice of Effective Opportunity to Make or Change Cash or Deferred Election* – Advises plan participants of the opportunity to make or change a salary deferral election.

- *401(k) Safe Harbor Notice* – Advises eligible employees of their rights and obligations under the plan, including safe harbor information.

- *Qualified Automatic Contribution Arrangement (QACA) Notice* – Advises eligible employees of their rights and obligations related to qualified automatic contribution arrangements.

- *Eligible Automatic Contribution Arrangement (EACA) Notice* – Advises eligible employees of their rights and obligations related to eligible automatic contribution arrangements.

- *Interested Party Notice* – Notifies participants if the plan pays or otherwise benefits an interested party (as defined under ERISA).

- *401(k) Safe Harbor Discontinuance Notice* – Notifies eligible employees of the consequences of an amendment during a plan year that reduces or suspends safe harbor matching contributions.

- *Updated Notice for Mid-Year Changes to Safe Harbor Plans or Safe Harbor Notices* – Provides and updated safe harbor notice that describes a mid-year change and its effective date.

- *Eligible Rollover Distribution Notice (§ 402(f) Notice)* – Describes the tax treatment and withholding rules related to rollover distributions.

- *Explanation of Income Tax Withholding Requirements* – Informs participants that the need not have federal income tax withheld from their distributions.

- *Explanation of Automatic Rollover* – Provides notice that, absence affirmative action by the participant, the participant's payments will automatically be rolled over to an IRA.

- *Consent to Distribution Explanation* – Obtains the participant's consent to a distribution over $5,000.

- *Notice of Right to Diversify Investments in Employer Securities* – Provides applicable individuals with the right to divest employer securities in their account and reinvest those amounts in certain diversified investments.

- *Domestic Relations Order and Qualified Domestic Relations Order Notices* – Notifies the participant of the plan's procedure for determining the qualified status of a domestic relations order.

- *Notice of Suspension of Benefit Upon Reemployment of Retiree* – Explains why a participant's benefits payments are being suspended.

- *Plan Service Provider Disclosures* (provided to plan fiduciaries) – Provides detailed information "about the compensation, both direct and indirect, that [the plan service providers] will receive for providing services to pension plans."

102.    Although caselaw suggests these disclosures provide would-be plaintiffs with sufficient information to determine fees, credits, forfeitures, and investment theories, they do not. It is likely that the only document that provides the pertinent information is the plan service provider agreement, which is not disclosed to plan participants outside of litigation, and even then, is likely under the cloak of a confidentiality agreement. Without the Plan service provider agreement, the Plan participants face an uphill battle in holding the Plan fiduciaries accountable. Courts have acknowledged and held that this imbalance entitles plaintiffs, who lack access to the relevant plan documents, to "reasonable discovery." *Hanson v. Wilcox*

42

*Veterinary Clinic PLLC*, 596 F. Supp. 3d 742, 750 (E.D. Tex. 2021) ("Considering that Plaintiffs do not have ready access to necessary plan documents, in conjunction with the purpose of ERISA, Plaintiffs are entitled to reasonable discovery on this claim regarding the management of plan assets"); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("[W]hile a plaintiff must offer sufficient factual allegations to show that he or she is not merely engaged in a fishing expedition or strike suit, we must also take account of their limited access to crucial information. If plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer. These considerations counsel careful and holistic evaluation of an ERISA complaint's factual allegations before concluding that they do not support a plausible inference that the plaintiff is entitled to relief.").

### E.    Defined Contribution Plan Forfeiture Accounts

103.    When employers contribute to their employees' 401(k) accounts, via matching contributions or profit sharing, these contributions often come with a vesting schedule.

104.    If a plan participant leaves their job before becoming fully vested in the employer contributions, they forfeit any portion of the employer contribution that has not yet vested. The forfeited funds are then held in the plans "forfeiture account".

105.    Forfeited funds must be *used* for the exclusive benefit of plan participants and beneficiaries. 29 U.S.C. § 1103(c)(1).

106.    How the forfeited funds are to be *used* is governed by the plan document.

107.    Under ERISA, fiduciaries must *use* forfeited funds pursuant to the plan document. 29 U.S.C. § 1104(a)(1)(d).

**F.    The Plan**

108.    The Plan is a defined contribution plan that is subject to the provisions of ERISA. The Plan is established and maintained under a written document as required by 29 U.S.C. § 1102(a). Defendant Swiss Re is the sponsor of the Plan ("Plan Sponsor"). The Plan is administered and controlled by the Board of Directors of Swiss Re ("Plan Administrator"). Empower Trust Company, LLC serves as the Plan's trustee (the "Trustee"). Empower provides recordkeeping and other administrative services to the Plan.

109.    As of December 31, 2023, the Plan's assets totaled approximately $1.45 billion, placing it in the top 0.1% of all defined contribution plans by plan size in the U.S.[25] The Plan provides retirement income for approximately 4,288 participants, comprised of Swiss Re employees, former employees, and their beneficiaries. Each participant's account is credited with the participant contributions, employer matching contributions, allocated forfeitures when applicable, and earnings or losses thereon. Participant accounts are charged with an allocation of administrative expenses. The Plan credits all revenue sharing received by the Plan to the accounts of those participants who had a balance in the fund that paid the revenue sharing amount. Allocations are based on participant earnings or balances. The benefit to

---

[25] The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2020 (pub. Sept. 2023), https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf (accessed Jan. 22, 2025).

which a participant is entitled is the benefit that can be provided from the participant's vested account balance.

110.    A participant's retirement account balance depends on contributions made by each employee, Swiss Re's matching contributions, and the performance of investment options net of fees and expenses. Accordingly, poor investment performance can significantly impair the value of a participant's account. Over time, even seemingly small differences in performance can result in a significant difference in the amount of savings available at retirement. The Swiss Re Defendants control the selection and retention of the Plan's investment options.

111.    The available investment options for participants of the Plan include mutual funds, common collective trust funds, a stable value investment option and self-directed brokerage accounts. While Participants can choose from a variety of investment options, the investment options available to participants were selected and maintained by Swiss Re.

112.    Ultimately, Swiss Re's Employee Pension Plan Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance.

113.    The relevant investments have specific asset classes. An "asset class" is a grouping of similar investments, e.g., equities (stocks) or fixed income (bonds). Classes are often further divided into sub-classes, such as "large cap," "small cap," "mid cap," "international" and so forth.

114.    While Plan participants can choose which asset classes in which to invest, they have no control over the cost or performance of the investments selected by the Swiss Re Defendants within each asset class. Indeed, participants are captive investors whose choices are limited by the investment decisions made by the Swiss Re Defendants. The value of their individual accounts depended in large measure upon the decisions of the Swiss Re Defendants.

115.    An asset allocation program can be a benefit to participants – especially those with limited investment experience or time – in selecting a portfolio from a plan's investment menu. However, such service must be prudently monitored by a fiduciary to ensure it has the participants' best interests in mind. Regrettably, such was not the case here.

116.    Further, the Employee Pension Plan Committee designates a default investment, known as the Qualified Default Investment Alternative ("QDIA"). A retirement plan can designate one of the investment offerings from its lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets; if participants do not direct where their assets should be invested, all contributions are automatically invested in the QDIA. The Plan's QDIA is the J.P. Morgan Smart Retirement Target Date Fund, share class R5 ("JPM R5 TDF"), with a target date closest to the year a participant will reach retirement age.

## G.    Defendants' Breach of Fiduciary Duties

117.    Defendants breached their fiduciary duties of prudence and/or loyalty to the Plan in several significant ways. While each breach on its own constitutes an ERISA violation, when taken in the aggregate, these violations amount to egregious behavior.

### i.    The Plan's Excessive Recordkeeping and Administrative Costs

118.    The Swiss Re Defendants breached their fiduciary duties by allowing the Plan to pay excessive recordkeeping fees. The impact of such high fees on participant balances is aggravated by the effects of compounding, to the significant detriment of participants over time. This effect is illustrated by the below chart, published by the SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).[26]



119.    During the Class Period, participants paid Empower for recordkeeping services through direct charges to their accounts and indirectly through asset-based

---

[26] *Investor Bulletin, How Fees and Expenses Affect Your Investment Portfolio,* U.S.SECURITIES AND EXCHANGE COMMISSION, OFFICE OF INVESTOR EDUCATION AND ADVOCACY (Feb. 2014), https://www.sec.gov/investor/alerts/ib_fees_expenses.pdf (accessed Jan.15, 2025)

revenue sharing. The recordkeeping services provided to the Plan are and were the same standard services identified above, and those provided to comparable plans. For large plans like the Plan, any difference in services are immaterial to pricing considerations, the primary drivers of which are the number of participants and whether the plan fiduciaries employed a competitive process of soliciting bids to determine the reasonable market rate for the services required by the plan.

120.    In January 2024, Encore Fiduciary, one of the leading providers of fiduciary insurance to large plans across the U.S., published "The Encore Fiduciary Large-Plan Recordkeeping Benchmark Survey – What Large Defined Contribution Plans Pay for Recordkeeping Services" ("Encore Survey"). The Encore Survey tracked the recordkeeping fees of over 2,500 plans with $100 million or more in plan assets in 2020, 2021, and 2022. The Encore Survey tracked recordkeeping fees by both plan asset size and total number of participants. Further, the Encore Survey accounted for plans that included revenue sharing by totaling the revenue sharing charged from investment fees, and dividing that amount by the total number of plan participants to arrive at the average recordkeeping fee per participant.

121.    The Encore Survey results isolate the lowest and highest 10% of fees charged, and indicate both the median and average recordkeeping fee for each based on plan assets or participant size. The results are as follows:

 **2020 RK Fee By Plan Participant Size**



2020 RK Fee By Plan Participant Size

 **2020 RK Fee By Plan Asset Size**



2020 RK Fee By Plan Asset Size

 **2021 RK Fee By Plan Participant Size**



 **2021 RK Fee By Plan Asset Size**



 **2022 RK Fee By Plan Participant Size**



 **2022 RK Fee By Plan Asset Size**



122.    According to the Encore Survey, the average recordkeeping fee for plans with 2,500-5,000 participants were as follows:

| Year | 2020 | 2021 | 2022 |
|---|---|---|---|
| Average RK Fee Per Participant | $58 | $61 | $55 |
| Lowest 10% | $30 | $20 | $21 |
| Highest 10% | $96 | $100 | $82 |

123.    According to the Encore Survey, the average recordkeeping fee for plans with 1-5 billion dollars in assets were as follows:

| Year | 2020 | 2021 | 2022 |
|---|---|---|---|
| Average RK Fee Per Participant | $45 | $43 | $41 |
| Lowest 10% | $16 | $20 | $16 |
| Highest 10% | $61 | $69 | $68 |

124.    Since the start of the Class Period, the Swiss Re Defendants allowed the Plan to be charged total amounts of recordkeeping fees that far exceed the reasonable and average market rate for plans of similar participant size and assets. Based on a review of the Form 5500s filed on behalf of the Plan, between 2018-2023, the recordkeeper fees per participant were:

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Dir Comp per participant | $281.11 | $280.86 | $246.58 | $275.91 | $295.10 | $274.06 |

125.    Based on the Encore Survey results and figures disclosed in the Form 5500s, it is obvious the Plan has charged participants excessive recordkeeping fees. For example, in 2022 the Plan charged its participants $295.10 per year, this number is: (1) over 7 times the average recordkeeping fee ($41) per participant for plans

with1-5 billion dollars in assets in 2022; (2) over 5 times the average recordkeeping fee ($55) per participant for plans with 2,500-5,000 participants in 2022; and (3) over 3 times the recordkeeping fee ($82) per participant of the highest 10% of plans with 2,500-5,000 participants in 2022 included in the Encore Survey.

126.   A difference of $213.10-$254.10 per participant per year is significant, especially when dealing with a large plan, such as the Plan here. Multiplying the difference by the number of Plan participants in 2022 (4,315) equates to anywhere from $919,526.50-$1,096,441.50 in excessive recordkeeping fees in 2022 alone.

127.   Rather than agree to a $41, $55 or $82 per participant charge, Swiss Re, instead, allowed participants to pay fees of approximately $153 to $287 over the last eight years, resulting in the below approximate calculated damages:

| Year | Direct Comp. Per Participant | Year-End Participants | Direct Comp. Per Participant Less $41 | Damages Less $41 Per Participant | Direct Comp. Per Participant Less $55 | Damages Less $55 Per Participant | Direct Comp. Per Participant Less $82 | Damages Less $82 Per Participant |
|---|---|---|---|---|---|---|---|---|
| 2023 | $221.68 | 4,288 | $180.68 | **$774,747.00** | $166.68 | **$714,715.00** | $139.68 | **$598,939.00** |
| 2022 | $287.30 | 4,315 | $246.30 | **$1,062,767.00** | $232.30 | **$1,002,357.00** | $205.30 | **$885,852.00** |
| 2021 | $284.11 | 4,242 | $243.11 | **$1,031,272.00** | $229.11 | **$971,884.00** | $202.11 | **$857,350.00** |
| 2020 | $240.49 | 4,101 | $199.49 | **$818,122.00** | $185.49 | **$760,708.00** | $158.49 | **$649,981.00** |
| 2019 | $279.73 | 4,081 | $238.73 | **$974,257.00** | $224.73 | **$917,123.00** | $197.73 | **$806,936.00** |
| 2018 | $169.44 | 4,016 | $128.44 | **$515,816.00** | $114.44 | **$459,592.00** | $87.44 | **$351,160.00** |
| 2017 | $153.03 | 4,165 | $112.03 | **$466,623.00** | $98.03 | **$408,313.00** | $71.03 | **$295,858.00** |
| 2016 | $182.01 | 4,146 | $141.01 | **$584,634.00** | $127.01 | **$526,590.00** | $100.01 | **$414,648.00** |
| | | | **Direct Fee Damages:** | **$6,228,238.00** | | **$5,761,282.00** | | **$4,860,724.00** |

128.   An alternative method of approximately quantifying recordkeeping expenses is by utilizing Part II, Income and Expense Statement, the Expenses Section, line i (5) of the 5500s:

| Year | Direct Comp. Per Participant | Year-End Participants | Direct Comp. Per Participant Less $41 | Damages Less $41 Per Participant | Direct Comp. Per Participant Less $55 | Damages Less $55 Per Participant | Direct Comp. Per Participant Less $82 | Damages Less $82 Per Participant |
|---|---|---|---|---|---|---|---|---|
| 2023 | $274.06 | 4,288 | $233.06 | **$999,367.00** | $219.06 | **$939,335.00** | $192.06 | **$823,559.00** |
| 2022 | $295.10 | 4,315 | $254.10 | **$1,096,435.00** | $240.10 | **$1,036,025.00** | $213.10 | **$919,520.00** |
| 2021 | $275.91 | 4,242 | $234.91 | **$996,477.00** | $220.91 | **$937,089.00** | $193.91 | **$822,555.00** |
| 2020 | $246.58 | 4,101 | $205.58 | **$843,077.00** | $191.58 | **$785,663.00** | $164.58 | **$674,936.00** |
| 2019 | $280.86 | 4,081 | $239.86 | **$978,886.00** | $225.86 | **$921,752.00** | $198.86 | **$811,565.00** |
| 2018 | $281.11 | 4,016 | $240.11 | **$964,290.00** | $226.11 | **$908,066.00** | $199.11 | **$799,634.00** |
| 2017 | $227.48 | 4,165 | $186.48 | **$776,700.00** | $172.48 | **$718,390.00** | $145.48 | **$605,935.00** |
| 2016 | $256.08 | 4,146 | $215.08 | **$891,730.00** | $201.08 | **$833,686.00** | $174.08 | **$721,744.00** |
| | | | **Direct Fee Damages:** | **$7,546,962.00** | | **$7,080,006.00** | | **$6,179,448.00** |

129.    The Plan participants overpaid recordkeeping fees to Empower which resulted in a substantial loss to the Plan and to each participant's account balance.

130.    Further, the Encore Survey found that the majority of the 2,500 plans surveyed with over $500 million in assets maintain a "per-participant recordkeeping fee… with revenue sharing eliminated or minimal; and most revenue sharing is credited back to the plan or plan participants."[27]

131.    In addition to the Encore Survey, we have compiled 2023 data from various plans and their recordkeepers, across a multitude of industries to further evaluate the reasonableness of the Plan's recordkeeping fees.[28] The plans included in this analysis are similar in asset and participant size to the Plan, three of which are also receiving their recordkeeping services from Empower.

---

[27] *The Encore Fiduciary Large-Plan Recordkeeping Benchmark Study*, ENCORE FIDUCIARY at Page 9 (Jan. 2024) https://encorefiduciary.com/wp-content/uploads/2024/01/Encore-Large-Plan-Recordkeeping-Benchmark-Study-1.22v5.pdf (accessed Jan. 16, 2025).
[28] The plans included in this analysis were populated using the well-known financial technology platform "AdvisorPro," which provides access to data on 650,000 401(k) plans. *See* https://advizorpro.com/planpro/ (accessed Feb. 18, 2025).

| Company | Plan Name | Total Assets | Participants | Average balance | Direct Admin Expense | Direct Admin. Expenses (% of Assets) | Recordkeeper | Recordkeeper Cost Per Participant |
|---|---|---|---|---|---|---|---|---|
| Sidley Austin Llp | Sidley Austin Llp Savings And Investment Plan | $ 1,693,400,787.00 | 5,823.00 | $ 299,135.00 | $ 44,033.00 | 0.00003 | Schwab Retirement Plan Servicesinc | $ 7.56 |
| Allianz Asset Management Of America L.p. | Allianz Asset Management Of America L.p. 401(k) Savings And Retirement Plan | $ 1,550,310,088.00 | 5,041.00 | $ 309,814.00 | $ 91,117.00 | 0.00006 | Schwab Retirement Plan Servicesinc | $ 18.08 |
| Renesas Electronics America INC. | Renesas Electronics America INC. 401(k) Plan | $ 1,222,365,778.00 | 4,275.00 | $ 289,660.00 | $ 125,448.00 | 0.0001 | Fidelity | $ 29.34 |
| Eog Resources, INC. | Eog Resources, INC. Savings And Retirement Plan | $ 1,157,690,425.00 | 3,753.00 | $ 310,206.00 | $ 225,465.00 | 0.00019 | Schwab Retirement Plan Servicesinc | $ 60.08 |
| City National Bank | City National Bank Profit Sharing Plan | $ 1,518,842,481.00 | 8,543.00 | $ 179,681.00 | $ 594,132.00 | 0.00039 | Great West Life And Annuity Insurance, oneamerica Retirement Services | $ 69.55 |
| Aptiv Corporation | Aptiv Salaried 401(k) Plan | $ 1,536,961,636.00 | 6,399.00 | $ 240,188.00 | $ 480,224.00 | 0.00031 | Fidelity | $ 75.05 |
| United States Steel Corporation And Affiliated Cos. | United States Steel Corporation Savings Fund Plan For Salaried Employees | $ 1,631,490,309.00 | 5,586.00 | $ 303,646.00 | $ 420,907.00 | 0.00026 | Fidelity | $ 75.35 |
| Munich Reinsurance America, INC | Munich Re U.s. Savings Plan | $ 1,611,018,009.00 | 6,202.00 | $ 267,789.00 | $ 499,440.00 | 0.00031 | Vanguard | $ 80.53 |
| Alticor INC. | Amway Retirement Savings Plan | $ 1,235,370,422.00 | 4,974.00 | $ 255,453.00 | $ 421,029.00 | 0.00034 | Fidelity | $ 84.65 |
| Ropes & Gray Llp | Ropes & Gray Llp Retirement Savings Plan | $ 1,223,867,620.00 | 4,365.00 | $ 303,088.00 | $ 374,710.00 | 0.00031 | Great West Life And Annuity Insurance | $ 85.84 |
| The Mathworks, INC. | The Mathworks 401(k) Retirement Plan | $ 1,502,647,697.00 | 5,224.00 | $ 288,804.00 | $ 543,396.00 | 0.00036 | Schwab Retirement Plan Servicesinc | $ 104.02 |
| Arkema INC. | Arkema INC. Employees' Retirement Savings (401(k)) Plan | $ 1,105,701,120.00 | 4,403.00 | $ 251,353.00 | $ 458,773.00 | 0.00041 | Fidelity | $ 104.20 |
| Nomura Securities International, INC. | Nomura Securities International, INC. Retirement Investment Plan | $ 1,032,065,859.00 | 4,004.00 | $ 257,888.00 | $ 450,375.00 | 0.00044 | Vanguard | $ 112.48 |
| Avaya INC. | Avaya INC. Savings Plan For Salaried Employees | $ 1,397,038,508.00 | 5,450.00 | $ 259,721.00 | $ 680,375.00 | 0.00049 | Fidelity | $ 124.84 |
| Wec Energy Group, INC. | Wec Energy Group Retirement Savings Plan | $ 1,544,110,000.00 | 5,033.00 | $ 307,960.00 | $ 689,000.00 | 0.00045 | Fidelity | $ 136.90 |
| Holland & Knight Llp | Holland And Knight Profit Sharing Plan & Trust | $ 1,770,378,251.00 | 5,115.00 | $ 380,236.00 | $ 725,256.00 | 0.00041 | Fidelity | $ 141.79 |
| Framatome INC. | Framatome INC. 401(k) Retirement Plan | $ 1,194,830,155.00 | 3,886.00 | $ 318,028.00 | $ 588,708.00 | 0.00049 | Vanguard | $ 151.49 |
| Bmc Software, INC. | Bmc Software, INC. Savings And Investment Plan | $ 1,216,098,098.00 | 4,589.00 | $ 272,240.00 | $ 732,241.00 | 0.0006 | Fidelity | $ 159.56 |
| Alliant Energy Corporate Services, INC. | Alliant Energy Corporation 401(k) Savings Plan | $ 1,321,177,371.00 | 4,517.00 | $ 293,987.00 | $ 889,364.00 | 0.00067 | Great West Life And Annuity Insurance | $ 196.89 |
| Swiss Re America Holding Corporation | Swiss Re Group U.s. Employees' Savings Plan | $ 1,453,627,596.00 | 4,288.00 | $ 341,628.00 | $ 1,175,175.00 | 0.00081 | Great West Life And Annuity Insurance | $ 274.06 |

132.    Compared to the 19 similar plans included in the chart, Swiss Re's Plan participants paid the highest recordkeeper fee by over $75 per participant. In fact, Swiss Re's recordkeeping fee in 2023 was over $100 more per participant than almost every plan included, and more than double the cost of approximately 80% of the comparator plans.

133.    In addition to the large disparity in recordkeeping costs between the Plan and other plans of a similar size and participant count, Swiss Re's Plan has many qualities which make it attractive to recordkeepers. Swiss Re's Plan has a large amount of assets with a relatively smaller number of participants and a very high average balance per participant. In addition, Swiss Re is a professional organization that has no reliance on retail distribution outlets and satellites. Since most of the employees are located in fewer sites, there are less payroll considerations and potential costs in reference to enrollment meetings, among other things. Finally, since there is a relatively low count of participants with respect to Plan assets, there are less loans to maintain. It is reasonable to say this Plan is less likely to have challenges than most, if not all, plans of this size. Therefore, in addition to being highly attractive to recordkeepers, the Plan has a lot of cost negotiation advantages.

134.    Given the Plan's size and resulting negotiating power, with prudent management and administration, the Plan could have obtained reasonable rates for recordkeeping services, whether through negotiating a lower recordkeeping fee or switching to a service with a flat rate "per-participant" fee, which would have resulted

in a significantly lower recordkeeping fee than the effective per-participant recordkeeping rates set forth above.

135.   Accordingly, using publicly available data and information from the Form 5500 filings of similarly-sized defined contribution plans during the Class Period, other comparable plans were paying much lower fees than the Plan throughout the Class Period. It is clear evidence that the reasonable market rate is lower than the Plan's rate, as comparable plans were able to negotiate lower fees for materially identical services.

136.   The Swiss Re Defendants' failure to recognize that the Plan and its participants were grossly overcharged for recordkeeping services and their failure to take effective remedial actions amounts to a breach of their fiduciary duties. To the extent the Swiss Re Defendants had a process in place, it was imprudent and ineffective given the objectively unreasonable level of fees the Plan paid for recordkeeping services. Had the Swiss Re Defendants appropriately monitored the compensation paid to Empower and ensured that participants were only charged reasonable recordkeeping fees, Plan participants would not have lost millions of dollars in their retirement savings over the last decade.

### ii.   *Imprudent Investment Decisions*

137.   Several of the Plan's investment options are objectively imprudent.

#### a.   Imprudent Share Class Selection

138.   With regard to the "Target Date Fund" series included in the Plan, Swiss Re did not choose the share class with the lowest expense ratio that was available to

them, which it easily qualified for given the Plan's scale. Swiss Re's failure to take advantage of its access to the share class with the lowest expense ratio caused a relative loss of returns to the Plan participants.

139.    A target date fund ("TDF") is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually become more conservative as the assumed target retirement year approaches. TDFs offer investors dynamic, easy asset allocation, while providing both long-term growth and capital preservation. Throughout the Class Period, the Plan's default investment option has been the JPM R5 TDF, with a target date closest to the year a participant will reach retirement age.

140.    Swiss Re Defendants are responsible for selecting the Plan lineup and could have chosen better after-cost performing TDF families but elected to retain the J.P. Morgan Smart Retirement TDFs in the R5 Share Class. This imprudent decision, an outcome of poor methodology, has cost Plan participants significant growth in their retirement assets. Given the scale and dynamic advantages of the Plan, including the amount of assets dedicated to the TDFs and the high average balance per participant, the Plan easily qualified for the share class with the lowest expense ratio—JPM R6 TDF—which would have resulted in the participants receiving a higher compounding return. Further, the lower cost/higher return dynamic of the R6 shares would have provided Plan participants with greater clarity and understanding of their Plan assets, given that the Plan participants have varying degrees of investment sophistication, like the participants of any other retirement plan. Yet the

Swiss Re Defendants chose the R5 share class, a share class with a higher expense ratio which reduces the compounding returns that participants enjoy.

141.   In addition to maintaining a lower expense ratio, when comparing their annual return rates, JPM R6 TDFs have consistently outperformed the JPM R5 TDFs. As such, the Swiss Re Defendants' imprudent decision has cost the Plan Participants at least $1 million dollars in after-cost returns.

| Year | Damages |
|---|---|
| 2018 | $113,374 |
| 2019 | $201,689 |
| 2020 | $210,899 |
| 2021 | $302,748 |
| 2022 | $192,127 |
| 2023 | $232,239 |
| Total | $1,253,076 |

| 2018 | | | | |
|---|---|---|---|---|
| Fund Class | Plan Assets Under Management (AUM) | Rate of Return | Return | Damages |
| JPM Smart Ret 2025 R5 (JNSIX 7/31/07) | $18,284,454 | -6.58% | -$1,203,117.07 | |
| JPM Smart Ret 2025 R6 (JNSYX 11/03/14) | | -6.48% | -$1,184,832.62 | $18,284 |
| JPM Smart Ret 2030 R5 (JSMIX) | $35,930,503 | -7.54% | -$2,709,159.93 | |
| JPM Smart Ret 2030 R6 (JSMYX 11/03/14) | | -7.45% | -$2,676,822.47 | $32,337 |
| JPM Smart Ret 2035 R5 (SRJIX) | $14,915,115 | -8.76% | -$1,306,564.07 | |
| JPM Smart Ret 2035 R6 (SRJYX 11/3/2014) | | -8.66% | -$1,291,648.96 | $14,915 |
| JPM Smart Ret 2040 R5 (SMTIX) | $28,123,238 | -9.47% | -$2,663,270.64 | |
| JPM Smart Ret 2040 R6 (SMTYX 11/3/2014 ) | | -9.38% | -$2,637,959.72 | $25,311 |
| JPM Smart Ret 2045 R5 (JSAIX) | $12,589,065 | -9.72% | -$1,223,657.12 | |
| JPM Smart Ret 2045 R6 (JSAYX 11/3/14) | | -9.67% | -$1,217,362.59 | $6,295 |
| JPM Smart Ret 2050 R5 (JTSIX) | $11,408,914 | -9.77% | -$1,114,650.90 | |
| JPM Smart Ret 2050 R6 (JTSYX 11/3/2014) | | -9.64% | -$1,099,819.31 | $14,832 |
| JPM Smart Ret 2055 R5 (JFFIX) | $3,500,717 | -9.68% | -$338,869.41 | |
| JPM Smart Ret 2055 R6 (JFFYX 11/3/2014) | | -9.64% | -$337,469.12 | $1,400 |
| | | | Total Damages | $113,374 |

| 2019 | | | | |
|---|---|---|---|---|
| **Fund Class** | **Plan Assets Under Management (AUM)** | **Rate of Return** | **Return** | **Damages** |
| JPM Smart Ret 2025 R5 (JNSIX 7/31/07) | $23,494,621 | 18.48% | $4,341,805.96 | |
| JPM Smart Ret 2025 R6 (JNSYX 11/03/14) | | 18.66% | $4,384,096.28 | **$42,290** |
| JPM Smart Ret 2030 R5 (JSMIX) | $44,779,639 | 20.71% | $9,273,863.24 | |
| JPM Smart Ret 2030 R6 (JSMYX 11/03/14) | | 20.77% | $9,300,731.02 | **$26,868** |
| JPM Smart Ret 2035 R5 (SRJIX) | $21,119,781 | 22.52% | $4,756,174.68 | |
| JPM Smart Ret 2035 R6 (SRJYX 11/3/2014) | | 22.64% | $4,781,518.42 | **$25,344** |
| JPM Smart Ret 2040 R5 (SMTIX) | $37,074,879 | 24.11% | $8,938,753.33 | |
| JPM Smart Ret 2040 R6 (SMTYX 11/3/2014 ) | | 24.23% | $8,983,243.18 | **$44,490** |
| JPM Smart Ret 2045 R5 (JSAIX) | $19,087,956 | 24.83% | $4,739,539.47 | |
| JPM Smart Ret 2045 R6 (JSAYX 11/3/14) | | 25.02% | $4,775,806.59 | **$36,267** |
| JPM Smart Ret 2050 R5 (JTSIX) | $16,170,970 | 24.90% | $4,026,571.53 | |
| JPM Smart Ret 2050 R6 (JTSYX 11/3/2014) | | 25.01% | $4,044,359.60 | **$17,788** |
| JPM Smart Ret 2055 R5 (JFFIX) | $5,083,331 | 24.89% | $1,265,241.09 | |
| JPM Smart Ret 2055 R6 (JFFYX 11/3/2014) | | 25.06% | $1,273,882.75 | **$8,642** |
| | | | **Total Damages** | **$201,689** |

| 2020 | | | | |
|---|---|---|---|---|
| **Fund Class** | **Plan Assets Under Management (AUM)** | **Rate of Return** | **Return** | **Damages** |
| JPM Smart Ret 2025 R5 (JNSIX 7/31/07) | $29,608,782 | 11.84% | $3,505,679.79 | |
| JPM Smart Ret 2025 R6 (JNSYX 11/03/14) | | 11.89% | $3,520,484.18 | **$14,804** |
| JPM Smart Ret 2030 R5 (JSMIX) | $52,185,858 | 12.62% | $6,585,855.28 | |
| JPM Smart Ret 2030 R6 (JSMYX 11/03/14) | | 12.74% | $6,648,478.31 | **$62,623** |
| JPM Smart Ret 2035 R5 (SRJIX) | $27,309,589 | 14.34% | $3,916,195.06 | |
| JPM Smart Ret 2035 R6 (SRJYX 11/3/2014) | | 14.45% | $3,946,235.61 | **$30,041** |
| JPM Smart Ret 2040 R5 (SMTIX) | $42,546,013 | 15.09% | $6,420,193.36 | |
| JPM Smart Ret 2040 R6 (SMTYX 11/3/2014 ) | | 15.20% | $6,466,993.98 | **$46,801** |
| JPM Smart Ret 2045 R5 (JSAIX) | $23,230,036 | 15.52% | $3,605,301.59 | |
| JPM Smart Ret 2045 R6 (JSAYX 11/3/14) | | 15.64% | $3,633,177.63 | **$27,876** |
| JPM Smart Ret 2050 R5 (JTSIX) | $20,073,893 | 15.49% | $3,109,446.03 | |
| JPM Smart Ret 2050 R6 (JTSYX 11/3/2014) | | 15.59% | $3,129,519.92 | **$20,074** |
| JPM Smart Ret 2055 R5 (JFFIX) | $7,890,564 | 15.48% | $1,221,459.31 | |
| JPM Smart Ret 2055 R6 (JFFYX 11/3/2014) | | 15.59% | $1,230,138.93 | **$8,680** |
| | | | **Total Damages** | **$210,899** |

| 2021 | | | | |
|---|---|---|---|---|
| **Fund Class** | **Plan Assets Under Management (AUM)** | **Rate of Return** | **Return** | **Damages** |
| JPM Smart Ret 2025 R5 (JNSIX 7/31/07) | $33,460,010 | 8.57% | $2,867,522.86 | |
| JPM Smart Ret 2025 R6 (JNSYX 11/03/14) | | 8.74% | $2,924,404.87 | **$56,882** |
| JPM Smart Ret 2030 R5 (JSMIX) | $59,478,037 | 10.77% | $6,405,784.58 | |
| JPM Smart Ret 2030 R6 (JSMYX 11/03/14) | | 10.88% | $6,471,210.43 | **$65,426** |
| JPM Smart Ret 2035 R5 (SRJIX) | $35,734,248 | 13.93% | $4,977,780.75 | |
| JPM Smart Ret 2035 R6 (SRJYX 11/3/2014) | | 14.05% | $5,020,661.84 | **$42,881** |
| JPM Smart Ret 2040 R5 (SMTIX) | $50,245,796 | 15.74% | $7,908,688.29 | |
| JPM Smart Ret 2040 R6 (SMTYX 11/3/2014 ) | | 15.86% | $7,968,983.25 | **$60,295** |
| JPM Smart Ret 2045 R5 (JSAIX) | $28,175,922 | 17.53% | $4,939,239.13 | |
| JPM Smart Ret 2045 R6 (JSAYX 11/3/14) | | 17.65% | $4,973,050.23 | **$33,811** |
| JPM Smart Ret 2050 R5 (JTSIX) | $25,294,824 | 17.50% | $4,426,594.20 | |
| JPM Smart Ret 2050 R6 (JTSYX 11/3/2014) | | 17.60% | $4,451,889.02 | **$25,295** |
| JPM Smart Ret 2055 R5 (JFFIX) | $12,105,081 | 17.53% | $2,122,020.70 | |
| JPM Smart Ret 2055 R6 (JFFYX 11/3/2014) | | 17.68% | $2,140,178.32 | **$18,158** |
| | | | **Total Damages** | **$302,748** |

| 2022 | | | | |
|---|---|---|---|---|
| **Fund Class** | **Plan Assets Under Management (AUM)** | **Rate of Return** | **Return** | **Damages** |
| JPM Smart Ret 2025 R5 (JNSIX 7/31/07) | $29,454,496 | -15.57% | -$4,586,065.03 | |
| JPM Smart Ret 2025 R6 (JNSYX 11/03/14) | | -15.51% | -$4,568,392.33 | **$17,673** |
| JPM Smart Ret 2030 R5 (JSMIX) | $51,894,296 | -16.55% | -$8,588,505.99 | |
| JPM Smart Ret 2030 R6 (JSMYX 11/03/14) | | -16.45% | -$8,536,611.69 | **$51,894** |
| JPM Smart Ret 2035 R5 (SRJIX) | $32,752,292 | -17.24% | -$5,646,495.14 | |
| JPM Smart Ret 2035 R6 (SRJYX 11/3/2014) | | -17.14% | -$5,613,742.85 | **$32,752** |
| JPM Smart Ret 2040 R5 (SMTIX) | $44,161,893 | -17.74% | -$7,834,319.82 | |
| JPM Smart Ret 2040 R6 (SMTYX 11/3/2014 ) | | -17.63% | -$7,785,741.74 | **$48,578** |
| JPM Smart Ret 2045 R5 (JSAIX) | $25,481,760 | -18.15% | -$4,624,939.44 | |
| JPM Smart Ret 2045 R6 (JSAYX 11/3/14) | | -18.09% | -$4,609,650.38 | **$15,289** |
| JPM Smart Ret 2050 R5 (JTSIX) | $22,132,457 | -18.30% | -$4,050,239.63 | |
| JPM Smart Ret 2050 R6 (JTSYX 11/3/2014) | | -18.23% | -$4,034,746.91 | **$15,493** |
| JPM Smart Ret 2055 R5 (JFFIX) | $13,059,682 | -18.24% | -$2,382,086.00 | |
| JPM Smart Ret 2055 R6 (JFFYX 11/3/2014) | | -18.16% | -$2,371,638.25 | **$10,448** |
| | | | **Total Damages** | **$192,127** |

| 2023 | | | | |
|---|---|---|---|---|
| **Fund Class** | **Plan Assets Under Management (AUM)** | **Rate of Return** | **Return** | **Damages** |
| JPM Smart Ret 2025 R5 (JNSIX 7/31/07) | $30,018,785 | 13.46% | $4,040,528.46 | |
| JPM Smart Ret 2025 R6 (JNSYX 11/03/14) | | 13.58% | $4,076,551.00 | $36,023 |
| JPM Smart Ret 2030 R5 (JSMIX) | $60,845,716 | 15.53% | $9,449,339.69 | |
| JPM Smart Ret 2030 R6 (JSMYX 11/03/14) | | 15.59% | $9,485,847.12 | $36,507 |
| JPM Smart Ret 2035 R5 (SRJIX) | $41,168,455 | 17.42% | $7,171,544.86 | |
| JPM Smart Ret 2035 R6 (SRJYX 11/3/2014) | | 17.53% | $7,216,830.16 | $45,285 |
| JPM Smart Ret 2040 R5 (SMTIX) | $53,277,201 | 18.93% | $10,085,374.15 | |
| JPM Smart Ret 2040 R6 (SMTYX 11/3/2014 ) | | 18.98% | $10,112,012.75 | $26,639 |
| JPM Smart Ret 2045 R5 (JSAIX) | $33,172,230 | 19.89% | $6,597,956.55 | |
| JPM Smart Ret 2045 R6 (JSAYX 11/3/14) | | 20.01% | $6,637,763.22 | $39,807 |
| JPM Smart Ret 2050 R5 (JTSIX) | $29,388,955 | 20.32% | $5,971,835.66 | |
| JPM Smart Ret 2050 R6 (JTSYX 11/3/2014) | | 20.42% | $6,001,224.61 | $29,389 |
| JPM Smart Ret 2055 R5 (JFFIX) | $18,589,368 | 20.23% | $3,760,629.15 | |
| JPM Smart Ret 2055 R6 (JFFYX 11/3/2014) | | 20.33% | $3,779,218.51 | $18,589 |
| | | | **Total Damages** | **$232,239** |

142.   The availability of the JPM R6 TDFs—an investment option with a lower cost structure, generating higher after-cost returns than the JPM R5 TDFs—emphasizes the lack of viable methodology utilized by the Swiss Re Defendants in choosing Plan investment options. A prudent fiduciary acting in the sole interest of the Plan participants would never have considered the JPM R5 TDFs, given the availability of the JPM R6 TDFs.

143.   However, even if the Swiss Re Defendants had given some consideration to the JPM R6 TDFs, any objective and viable evaluation—as would be expected of any party with fiduciary status—would have recognized more consistent and better performing TDFs, given the relative superiority of alternative TDF suites. In

selecting and retaining the JPM R5 TDFs, the Swiss Re Defendants failed to carry out their responsibilities to focus solely on the interests of the participants. Had the Swiss Re Defendants acted in the sole interest of Plan participants by, for example, simply weighing the benefits of the JPM R5 TDFs against readily available alternative TDFs, the Swiss Re Defendants would have concluded that the JPM R5 TDFs represented a clearly inferior option and were therefore an inappropriate offering in the Plan lineup.

144.    Due to the Swiss Re Defendants' poor methodology in selecting and reviewing the JPM R5 TDFs, Plan participants have lost significant growth in their retirement assets, which decreases the likelihood that Plan participants will reach their expected lifestyle in retirement.

b.    The Alternative Investments and Plans' Default Investment Option

145.    When making investment selections for an employer sponsored defined contribution plan, prudent fiduciaries utilize certain methodologies, such as the tools of Modern Portfolio Theory, to analyze the risk, return, and volatility of investment options.

146.    Morningstar is the industry standard investment research tool utilized by investment management organizations to evaluate and compare investment options.

147.    Morningstar groups investment options into specific "categories" based on investment attributes such as risk, return, and behavior profiles. Through

Morningstar, fiduciaries use "search levers" to identify investments by their Morningstar Category.

148.    Here, the Swiss Re Defendants not only failed to apply the requisite and known industry standard fiduciary tools that are utilized to evaluate the investments in question but, as a result, did not use them to take advantage of the dynamic attributes of the Plan in the sole interest of the participants. If the Swiss Re Defendants had utilized a prudent methodology in making their investment decisions, a variety of other investments in the same Morningstar Category would have been include in the Plan instead, as they all outperform the investments chosen by the Swiss Re Defendants.

149.    In addition to reviewing an investment's rate of return, when fiduciaries and their advisors make investment option and review decisions, gauging performance relative to category rankings is very important because it helps gain perspective on how well an investment performs relative to others in its peer group. For example, Quartile Rank is a measure of how well an investment has performed against all others in its Morningstar Category. If an investment is ranked in the 3rd quartile, it is underperforming at least 50% of all investments in its Morningstar Category. This information is offered through Morningstar, a readily available resource.

| Fund | 2023 | | 2022 | | 2021 | |
|---|---|---|---|---|---|---|
| | Return Rate | Quart Rank/ Percentile Rank | Return Rate | Quart Rank/ Percentile Rank | Return Rate | Quart Rank/ Percentile Rank |
| JPM Smart Ret 2025 R5 (JNSIX 7/31/07) | 13.46% | 2nd/39th | -15.57% | 3rd/52nd | 8.57% | 4th/81st |
| Trowe Ret I  2025 I (TRPHX 9/19/15) | 14.71% | 1st/5th | -15.46% | 2nd/47th | 12.04% | 1st/5th |
| Trowe Ret 2025 C CIT | 14.76% | 1st/3rd | -15.49% | 2nd/48th | 11.82% | 1st/14th |
| Trowe Ret HY 2025 T4 CIT 01/05/09) | 14.98% | 1st/2nd | -14.58% | 2nd/29th | 11.78% | 1st/14th |
| Am 2025 Trgt Ret R6 (RFDTX) | 11.94% | 3rd/73rd | -12.74% | 1st/8th | 11.44% | 1st/17th |
| Mutual of America 2025 (MURHX) | 13.59% | 2nd/36th | -13.56% | 1st/18th | 11.96% | 1st/12th |
| MM Sel TRP Ret2025 I (MMTFX) | 14.73% | 1st/3rd | -15.61% | 3rd/53rd | 11.78% | 1st/14th |
| Callan GP 2025 R6 CIT (4/28/08) | 13.11% | 2nd/48th | -12.80% | 1st/9th | 15.53% | 1st/1st |
| TC/Nuveen Ind 2025 R6 (9/30/09) | 14.19% | 1st/17th | -15.02% | 2nd/33rd | 10.14% | 2nd/45th |
| JPM Smart Ret 2030 R5 (JSMIX) | 15.53% | 2nd/26th | -16.55% | 3rd/55th | 10.77% | 4th/81st |
| Trowe Ret I  2030 I (TRPCX) | 16.54% | 1st/6th | -16.86% | 3rd/69th | 13.75% | 1st/12th |
| Trowe Ret 2030 C CIT | 16.58% | 1st/4th | -16.79% | 3rd/64th | 13.54% | 1st/13th |
| Trowe Ret HY 2030 T4 CIT (01/05/09) | 16.86% | 1st/3rd | -15.67% | 2nd/30th | 13.54% | 1st/13th |
| Am 2030 Trgt Ret R6 (RFETX) | 14.52% | 3rd/55th | -14.50% | 1st/19th | 13.16% | 1st/16th |
| Mutual of America 2030 (MURIX) | 15.25% | 2nd/35th | -14.14% | 1st/15th | 15.29% | 1st/1st |
| MM Sel TRP Ret 2030 I (MMTRX) | 16.55% | 1st/4th | -16.96% | 3rd/75th | 13.51% | 1st/13th |
| Callan GP 2030 R6 CIT (4/28/08) | 14.41% | 3rd/60th | -13.82% | 1st/13th | 16.88% | 1st/1st |
| TC/Nuveen Life Ind 2030 R6 (TLHIX 9/30/09) | 15.55% | 1st/23rd | -15.70% | 2nd/30th | 11.67% | 2nd/50th |
| JPM Smart Ret 2035 R5 (SRJIX) | 17.42% | 1st/25th | -17.24% | 3rd/52nd | 13.93% | 2nd/47th |
| Trowe Ret I  2035 I (TRPJX) | 18.32% | 1st/4th | -17.85% | 3rd/72nd | 15.28% | 1st/15th |
| Trowe Ret 2035 C CIT | 18.47% | 1st/2nd | -17.75% | 3rd/70th | 15.13% | 1st/16th |
| Trowe Ret HY 2035 T4 CIT 01/05/09) | 18.71% | 1st/2nd | -16.35% | 2nd/27th | 15.23% | 1st/15th |
| Am 2035 Trgt Ret R6 (RFFTX) | 16.90% | 2nd/40th | -16.24% | 1st/24th | 15.54% | 1st/11th |
| Mutual of America 2035 (MURJX) | 17.26% | 2nd/30th | -15.20% | 1st/12th | 17.84% | 1st/1st |
| MM Sel TRP Ret 2035 I (MMTJX) | 18.37% | 1st/2nd | -17.89% | 3rd/75th | 15.08% | 1st/17th |
| Callan GP 2035 R6 CIT (4/28/08) | 15.66% | 3rd/73rd | -14.58% | 1st/8th | 17.95% | 1st/1st |
| TC/Nuveen Life Ind 2035 R6 (TLYIX 9/30/09) | 17.25% | 2nd/32nd | -16.28% | 1st/25th | 13.21% | 3rd/69th |

| Fund | 2023 | | 2022 | | 2021 | |
|---|---|---|---|---|---|---|
| | Return Rate | Quart Rank/ Percentile Rank | Return Rate | Quart Rank/ Percentile Rank | Return Rate | Quart Rank/ Percentile Rank |
| JPM Smart Ret 2040 R5 (SMTIX) | 18.93% | 2nd/28th | -17.74% | 2nd/48th | 15.74% | 3rd/51st |
| Trowe Ret I  2040 I (TRPDX) | 19.80% | 1st/10th | -18.72% | 4th/85th | 16.58% | 1st/22nd |
| Trowe Ret 2040 C CIT | 19.96% | 1st/5th | -18.50% | 4th/76th | 16.37% | 2nd/27th |
| Trowe Ret HY 2040 T4 CIT 01/05/09) | 20.23% | 1st/2nd | -16.90% | 2nd/32nd | 16.70% | 1st/17th |
| Am 2040 Trgt Ret R6 (RFGTX) | 19.33% | 1st/17th | -17.55% | 2nd/43rd | 16.83% | 1st/16th |
| Mutual of America 2040 (MURLX) | 18.87% | 2nd/33rd | -15.37% | 1st/14th | 19.89% | 1st/1st |
| MM Sel TRP Ret 2040 I (MMFOX) | 19.85% | 1st/7th | -18.77% | 4th/86th | 16.43% | 1st/25th |
| Callan GP 2040 R6 CIT (4/28/08) | 16.75% | 4th/77th | -15.06% | 1st/8th | 18.77% | 1st/1st |
| TC/Nuveen Life Ind 2040 R6 (TLZIX 9/30/09) | 18.98% | 1st/25th | -16.68% | 2nd/27th | 14.89% | 3rd/70th |
| JPM Smart Ret 2045 R5 (JSAIX) | 19.89% | 2nd/34th | -18.15% | 3rd/51st | 17.53% | 1st/23rd |
| Trowe Ret I  2045 I (TRPKX) | 20.63% | 1st/14th | -18.98% | 1st/83rd | 17.43% | 2nd/28th |
| Trowe Ret 2045 C CIT | 20.88% | 1st/6th | -18.71% | 3rd/75th | 17.31% | 2nd/31st |
| Trowe Ret HY 2045 T4 CIT 01/06/09) | 21.08% | 1st/2nd | -17.05% | 1st/25th | 17.56% | 1st/22nd |
| Am 2045 Trgt Ret R6 (RFHTX 7/13/09) | 20.15% | 1st/21st | -18.18% | 3rd/52nd | 17.18% | 2nd/35th |
| Mutual of America 2045 (MURMX) | 19.64% | 2nd/42nd | -15.59% | 1st/11th | 20.57% | 1st/1st |
| MM Sel TRP Ret 2045 I (MMFTX) | 20.73% | 1st/9th | -18.97% | 4th/81st | 17.27% | 2nd/32nd |
| Callan GP 2045 R6 CIT (4/28/08) | 17.58% | 4th/86th | -15.62% | 1st/12th | 18.97% | 1st/6th |
| TC/Nuveen Life Ind 2045 R6 (TLXIX 9/30/09) | 20.07% | 1st/23rd | -17.24% | 2nd/26th | 16.65% | 2nd/52nd |
| JPM Smart Ret 2050 R5 (JTSIX) | 20.32% | 2nd/39th | -18.30% | 2nd/50th | 17.50% | 2nd/40th |
| Trowe Ret I 2050 I (TRPMX) | 20.92% | 1st/18th | -19.09% | 4th/78th | 17.54% | 2nd/39th |
| Trowe Ret 2050 C CIT | 21.18% | 1st/11th | -18.81% | 3rd/69th | 17.44% | 2nd/41st |
| Trowe Ret HY 2050 T4 CIT 01/06/09) | 21.39% | 1st/4th | -17.12% | 1st/25th | 17.70% | 2nd/35th |
| Am 2050 Trgt Ret R6 (RFITX) | 20.83% | 1st/20th | -18.89% | 3rd/71st | 17.27% | 2nd/43rd |
| Mutual of America 2050 (MURNX) | 19.94% | 3rd/51th | -15.66% | 1st/8th | 20.82% | 1st/2nd |
| MM Sel TRP Ret 2050 I (MMDDX) | 20.99% | 1st/14th | -19.11% | 4th/80th | 17.38% | 2nd/41st |
| Callan GP 2050 R6 CIT (4/28/08) | 18.04% | 4th/86th | -15.77% | 1st/9th | 18.96% | 1st/10th |
| TC/Nuveen Life Ind 2050 R6 (TLLIX 9/30/09) | 20.54% | 2nd/26th | -17.50% | 2nd/30th | 17.14% | 2nd/49th |

| Fund | 2023 | | 2022 | | 2021 | |
|---|---|---|---|---|---|---|
| | Return Rate | Quart Rank/ Percentile Rank | Return Rate | Quart Rank/ Percentile Rank | Return Rate | Quart Rank/ Percentile Rank |
| JPM Smart Ret 2055 R5 (JFFIX) | 20.23% | 2nd/45th | -18.24% | 2nd/47th | 17.53% | 2nd/40th |
| Trowe Ret I 2055 I (TRPNX 8/25/15) | 20.93% | 1st/23rd | -19.12% | 4th/79th | 17.57% | 2nd/39th |
| Trowe Ret 2055 C CIT | 21.28% | 1st/11th | -18.88% | 3rd/71st | 17.41% | 2nd/43rd |
| Trowe Ret HY 2055 T4 CIT 01/06/09) | 21.46% | 1st/9th | -17.16% | 1st/18th | 17.71% | 2nd/36th |
| Am 2055 Trgt Ret R6 (RFKTX) | 21.40% | 1st/9th | -19.50% | 4th/89th | 17.28% | 2nd/48th |
| Mutual of America 2055 (MUROX) | 19.98% | 3rd/56th | -15.77% | 1st/8th | 21.11% | 1st/1st |
| MM Sel TRP Ret 2055 I (MMDJX) | 21.06% | 1st/17th | -19.13% | 4th/79th | 17.38% | 2nd/45th |
| Callan GP 2055 R6 CIT (4/28/08) | 18.02% | 4th/86th | -15.77% | 1st/8th | 19.01% | 1st/12th |
| TC/Nuveen Life Ind 2055 R6 (TTIIX 4/29/11) | 20.76% | 2nd/27th | -17.57% | 2nd/27th | 17.39% | 2nd/44th |
| JPM Smart Ret 2060 R5 (JAKIX) | 20.13% | 3rd/55th | -18.17% | 2nd/43rd | 17.54% | 2nd/48th |
| Trowe Ret I 2060 I (TRPLX) | 20.93% | 2nd/29th | -19.10% | 4th/77th | 17.55% | 2nd/47th |
| Trowe Ret 2060 C CIT | 21.19% | 1st/18th | -18.87% | 3rd/71st | 17.44% | 2nd/50th |
| Trowe Ret HY 2060 T4 CIT 01/16/15) | 21.52% | 1st/10th | -17.15% | 1st/20th | 17.65% | 2nd/43rd |
| Am 2060 Trgt Ret R6 (RFUTX) | 21.61% | 1st/10th | -19.66% | 4th/93rd | 17.19% | 3rd/56th |
| Mutual of America 2060 (MURPX) | 20.19% | 3rd/51st | -15.72% | 1st/7th | 21.60% | 1st/1st |
| MM Selt TRP Ret 2060 I (MMSKX 2/16/18) | 21.13% | 1st/18th | -19.16% | 4th/79th | 17.35% | 3rd/52nd |
| Callan GP 2060 R6 CIT (4/28/08) | 18.03% | 4th/89th | -15.75% | 1st/7th | 18.96% | 1st/17th |

| Fund | 2020 | | 2019 | | 2018 | |
|---|---|---|---|---|---|---|
| | Return Rate | Quart Rank/ Percentile Rank | Return Rate | Quart Rank/ Percentile Rank | Return Rate | Quart Rank/ Percentile Rank |
| JPM Smart Ret 2025 R5 (JNSIX 7/31/07) | 11.84% | 3rd/64th | 18.48% | 3rd/52nd | -6.58% | 4th/91st |
| Trowe Ret I 2025 I (TRPHX 9/19/15) | 14.62% | 1st/12th | 21.15% | 1st/2nd | -5.54% | 3rd/57th |
| Trowe Ret 2025 C CIT | 14.95% | 1st/4th | 21.28% | 1st/1st | -5.46% | 3rd/54th |
| Trowe Ret HY 2025 T4 CIT (01/05/09) | 15.31% | 1st/2nd | 21.10% | 1st/2nd | -5.41% | 2nd/50th |
| Am 2025 Trgt Ret R6 (RFDTX 7/13/09) | 13.67% | 2nd/27th | 17.85% | 3rd/68th | -3.47% | 1st/2nd |
| Mutual of America 2025 (MURHX 11/5/07) | 10.26% | 4th/81st | 19.79% | 1st/16th | -5.22% | 2nd/44th |
| MM Sel TRP Ret 2025 I (MMTFX 2/16/18) | 14.75% | 1st/8th | 21.35% | 1st/1st | N/A | N/A |
| Callan GP 2025 R6 CIT (5/19/08) | 13.16% | 2nd/43rd | 20.42% | 1st/8th | -4.51% | 1st/23rd |
| TC/Nuveen Ind 2025 R6 (9/30/09) | 14.00% | 1st/20th | 19.59% | 1st/22nd | -4.42% | 1st/20th |
| JPM Smart Ret 2030 R5 (JSMIX) | 12.62% | 3rd/65th | 20.71% | 2nd/44th | -7.54% | 4th/92nd |
| Trowe Ret I 2030 I (TRPCX) | 15.92% | 1st/7th | 22.68% | 1st/4th | -6.16% | 2nd/46th |
| Trowe Ret 2030 C CIT | 16.13% | 1st/5th | 22.84% | 1st/1st | -6.05% | 2nd/41st |
| Trowe Ret HY 2030 T4 CIT (01/05/09) | 16.35% | 1st/5th | 22.74% | 1st/4th | -6.04% | 2nd/41st |
| Am 2030 Trgt Ret R6 (RFETX) | 15.16% | 1st/17th | 20.06% | 3rd/60th | -4.16% | 1st/2nd |
| Mutual of America 2030 (MURIX) | 11.67% | 4th/79th | 21.93% | 1st/19th | -6.49% | 3rd/56th |
| MM Sel TRP Ret 2030 I (MMTRX) | 15.94% | 1st/5th | 22.95% | 1st/1st | N/A | |
| Callan GP 2030 R6 CIT (4/28/08) | 14.15% | 2nd/38th | 21.96% | 1st/18th | -5.39% | 1st/24th |
| TC/Nuveen Life Ind 2030 R6 (TLHIX 9/30/09) | 14.76% | 1st/22nd | 21.35% | 1st/24th | -5.04% | 1st/13th |
| JPM Smart Ret 2035 R5 (SRJIX) | 14.34% | 2nd/49th | 22.52% | 2nd/39th | -8.76% | 4th/97th |
| Trowe Ret I 2035 I (TRPJX) | 17.04% | 1st/12th | 23.90% | 1st/14th | -6.81% | 2nd/41st |
| Trowe Ret 2035 C CIT | 17.27% | 1st/8th | 24.05% | 1st/11th | -6.56% | 2nd/28th |
| Trowe Ret HY 2035 T4 CIT (01/05/09) | 17.19% | 1st/8th | 24.05% | 1st/11th | -6.54% | 2nd/27th |
| Am 2035 Trgt Ret R6 (RFFTX) | 17.55% | 1st/5th | 23.29% | 1st/21st | -5.14% | 1st/6th |
| Mutual of America 2035 (MURJX) | 12.61% | 4th/82nd | 23.62% | 1st/17th | -7.36% | 3rd/60th |
| MM Sel TRP Ret 2035 I (MMTJX) | 16.98% | 1st/12th | 24.22% | 1st/11th | N/A | |
| Callan GP 2035 R6 CIT (4/28/08) | 14.85% | 2nd/39th | 23.16% | 1st/22nd | -6.08% | 1st/19th |
| TC/Nuveen Life Ind 2035 R6 (TLYIX 9/30/09) | 15.54% | 2nd/28th | 23.02% | 2nd/28th | -5.73% | 1st/11th |

| Fund | 2020 Return Rate | 2020 Quart Rank/ Percentile Rank | 2019 Return Rate | 2019 Quart Rank/ Percentile Rank | 2018 Return Rate | 2018 Quart Rank/ Percentile Rank |
|---|---|---|---|---|---|---|
| JPM Smart Ret 2040 R5 (SMTIX) | 15.09% | 2nd/47th | 24.11% | 2nd/35th | -9.47% | 4th/95th |
| Trowe Ret I 2040 I (TRPDX) | 18.16% | 1st/11th | 24.89% | 1st/17th | -7.21% | 2nd/31st |
| Trowe Ret 2040 C CIT | 18.37% | 1st/8th | 25.08% | 1st/14th | -6.96% | 1st/24th |
| Trowe Ret HY 2040 T4 CIT (01/05/09) | 17.91% | 1st/13th | 25.15% | 1st/12th | -6.94% | 1st/23rd |
| Am 2040 Trgt Ret R6 (RFGTX) | 18.77% | 1st/4th | 24.40% | 2nd/28th | -5.52% | 1st/4th |
| Mutual of America 2040 (MURLX) | 13.43% | 3rd/73rd | 24.25% | 2nd/31st | -7.94% | 3rd/55th |
| MM Sel TRP Ret 2040 I (MMFOX) | 17.99% | 1st/13th | 25.15% | 1st/12th | N/A | |
| Callan GP 2040 R6 CIT (4/28/08) | 15.52% | 2nd/40th | 23.99% | 2nd/37th | -6.36% | 1st /11th |
| TC/Nuveen Life Ind 2040 R6 (TLZIX 9/30/09) | 16.27% | 2nd/29th | 24.52% | 1st/25th | -6.67% | 1st/19th |
| JPM Smart Ret 2045 R5 (JSAIX) | 15.52% | 2nd/49th | 24.83% | 2nd/44th | -9.72% | 4th/92nd |
| Trowe Ret I 2045 I (TRPKX) | 18.72% | 1st/7th | 25.52% | 1st/23rd | -7.51% | 2nd/29th |
| Trowe Ret 2045 C CIT | 18.85% | 1st/5th | 25.76% | 1st/17th | -7.22% | 1st/18th |
| Trowe Ret HY 2045 T4 CIT (01/06/09) | 18.32% | 1st/12th | 25.91% | 1st/14th | -7.29% | 1st/22nd |
| Am 2045 Trgt Ret R6 (RFHTX 7/13/09) | 19.21% | 1st/4th | 24.68% | 3rd/51st | -5.58% | 1st/3rd |
| Mutual of America 2045 (MURMX) | 13.31% | 1st/81st | 24.54% | 2nd/56th | -8.29% | 3rd/56th |
| MM Sel TRP Ret 2045 I (MMFTX) | 18.51% | 1st/8th | 25.87% | 1st/15th | N/A | |
| Callan GP 2045 R6 CIT (4/28/08) | 15.91% | 2nd/43rd | 24.59% | 3rd/53rd | -7.04% | 1st/14th |
| TC/Nuveen Life Ind 2045 R6 (TLXIX 9/30/09) | 17.02% | 2nd/26th | 25.84% | 1st/15th | -6.92% | 1st/12th |
| JPM Smart Ret 2050 R5 (JTSIX) | 15.49% | 3rd/54th | 24.90% | 2nd/49th | -9.77% | 4th/88th |
| Trowe Ret I 2050 I (TRPMX) | 18.72% | 1st/9th | 25.57% | 2nd/30th | -7.51% | 1st/21st |
| Trowe Ret 2050 C CIT | 18.84% | 1st/9th | 25.75% | 1st/25th | -7.28% | 1st/15th |
| Trowe Ret HY 2050 T4 CIT (01/06/09) | 18.24% | 1st/15th | 25.96% | 1st/18th | -7.27% | 1st/15th |
| Am 2050 Trgt Ret R6 (RFITX) | 19.42% | 1st/6th | 25.04% | 2nd/43rd | -5.61% | 1st/3rd |
| Mutual of America 2050 (MURNX) | 13.39% | 4th/79th | 24.65% | 3rd/57th | -8.74% | 3rd/60th |
| MM Sel TRP Ret 2050 I (MMDDX) | 18.51% | 1st/10th | 25.92% | 1st/19th | N/A | |
| Callan GP 2050 R6 CIT (4/28/08) | 15.97% | 2nd/43rd | 24.60% | 3rd/58th | -7.04% | 1st/10th |
| TC/Nuveen Life Ind 2050 R6 (TLLIX 9/30/09) | 17.20% | 2nd/28th | 26.03% | 1st/16th | -7.01% | 1st/9th |
| JPM Smart Ret 2055 R5 (JFFIX) | 15.48% | 3rd/55th | 24.89% | 3rd/55th | -9.68% | 4th/84th |
| Trowe Ret I 2055 I (TRPNX 8/25/15) | 18.68% | 1st/8th | 25.52% | 2nd/35th | -7.50% | 1st/20th |
| Trowe Ret 2055 C CIT | 18.80% | 1st/8th | 25.75% | 2nd/28th | -7.28% | 1st/15th |
| Trowe Ret HY 2055 T4 CIT (01/06/09) | 18.29% | 1st/14th | 25.93% | 1st/25th | -7.30% | 1st/16th |
| Am 2055 Trgt Ret R6 (RFKTX) | 19.39% | 1st/5th | 25.09% | 2nd/45th | -5.65% | 1st/3rd |
| Mutual of America 2055 (MUROX) | 13.93% | 3rd/75th | 24.40% | 3rd/70th | -8.88% | 3rd/64th |
| MM Sel TRP Ret 2055 I (MMDJX) | 18.44% | 1st/11th | 25.89% | 1st/25th | N/A | |
| Callan GP 2055 R6 CIT (4/28/08) | 16.05% | 2nd/44th | 24.61% | 3rd/64th | -7.14% | 1st/12th |
| TC/Nuveen Life Ind 2055 R6 (TTIIX 4/29/11) | 17.22% | 2nd/26th | 26.37% | 1st/13th | -7.14% | 1st/11th |

150.    Based on the outcomes of the Swiss Re Defendants' methodologies, it is apparent they failed to consider to the superior alternative investments that were available to them in any given year while "looking back" at previous years during the Class Period and in many cases "before." A fiduciary applying a viable methodology would have gained additional historic perspective given different domestic and global investment economics.

151.    Here, the Swiss Re Defendants did not consider the after-cost rate of return, quartile rankings, or percentile rankings, as the majority of comparator investments in the same Morningstar Category consistently outperformed the Plan's JPM R5 TDFs in these measurements throughout the Class Period.

152.    The Swiss Re Defendants' lack of consideration to the after-cost rate of return, quartile rankings, and percentile rankings extends to the non-TDFs included in the Plan, such as "Am EuroPac Gr R6 (RERGX 5/1/09) 401K" and "Am Gro Fd of Am R6 (RGAGX)." The following charts reinforce the fact that there were a variety of comparable investments available that consistently outperformed the non-TDF investments throughout the Class Period.

| | 2023 | | 2022 | | 2021 | |
|---|---|---|---|---|---|---|
| Fund | Return Rate | Quart Rank/ Percentile Rank | Return Rate | Quart Rank/ Percentile Rank | Return Rate | Quart Rank/ Percentile Rank |
| | | | | | | |
| Am EuroPac Gr R6 (RERGX 5/1/09) 401K | 16.05% | 3rd/53rd | -22.72% | 2nd/38th | 2.84% | 4th/80th |
| GS GQG Ptners Intl Opps R6 (12/15/16 5 Mil Min GSIYX) | 22.11% | 1st/6th | -11.03% | 1st/1st | 12.45% | 1st/23rd |
| WCM Foc Intl Gro Inst (WCMIX) (5/31/11) | 16.56% | 2nd/50th | -28.90% | 3rd/75th | 17.02% | 1st/9th |
| PGIM Jenn Int'l Opps R6 (PWJQX 12/23/15) | 20.34% | 1st/17th | -36.91% | 4th/94th | 13.34% | 1st/18th |
| Virtus SGA Int'l Gro I (STITX 1/31/95) | 17.25% | 2nd/44th | -18.19% | 1st/11th | 8.59% | 3rd/55th |

| Fund | 2020 | | 2019 | | 2018 | |
|---|---|---|---|---|---|---|
| | Return Rate | Quart Rank/ Percentile Rank | Return Rate | Quart Rank/ Percentile Rank | Return Rate | Quart Rank/ Percentile Rank |
| Am EuroPac Gr R6 (RERGX 5/1/09) 401K | 25.27% | 2nd/33rd | 27.40% | 3rd/59th | -14.91% | 3rd/58th |
| GS GQG Ptners Intl Opps R6 (12/15/16 5 Mil Min GSIYX) | 15.86% | 4th/77th | 27.59% | 3rd/56th | -6.02% | 1st/2nd |
| WCM Foc Intl Gro Inst (WCMIX) (5/31/11) | 32.82% | 1st/14th | 35.18% | 1st/7th | -7.30% | 1st/4th |
| PGIM Jenn Int'l Opps R6 (PWJQX 12/23/15) | 55.61% | 1st/5th | 38.29% | 1st/1st | -12.82% | 2nd/35th |
| Virtus SGA Int'l Gro I (STITX 1/31/95) | 23.17% | 2nd/41st | 28.61% | 2nd/43rd | -7.69% | 1st/5th |

| Fund | 2023 | | 2022 | | 2021 | |
|---|---|---|---|---|---|---|
| | Return Rate | Quart Rank/ Percentile Rank | Return Rate | Quart Rank/ Percentile Rank | Return Rate | Quart Rank/ Percentile Rank |
| Am Gro Fd of Am R6 (RGAGX) | 37.65% | 3rd/51st | -30.49% | 3rd/54th | 19.69% | 3rd/64th |
| Baron Partners I (BPTIX 5/29/09) | 43.47% | 2nd/27th | -42.41% | 4th/94th | 31.73% | 1st/5th |
| Baron Partners R6 (BPTUX 8/31/16) | 43.46% | 2nd/27th | -42.41% | 4th/95th | 31.73% | 1st/5th |
| Van Gro Ind Adm (VIGAX 11/13/2000) | 46.77% | 1st/17th | -33.14% | 3rd/71st | 27.26% | 1st/19th |
| Fid Grow Co K (FGCKX 5/9/2008) | 47.33% | 1st/16th | -33.74% | 3rd/74th | 22.73% | 2nd/48th |
| Am Cen Ultra I (TWUIX 11/14/96) | 43.49% | 2nd/27th | -32.33% | 3rd/66th | 23.45% | 2nd/42nd |
| Fid OTC K (FOCKX) | 42.92% | 2nd/30th | -32.12% | 3rd/65th | 25.15% | 2nd/32nd |
| Del Ivy LC Gro R6 (ILGRX (7/31/14) | 38.23% | 2nd/49th | -26.77% | 2nd/35th | 30.57% | 1st/6th |

| Fund | 2020 | | 2019 | | 2018 | |
|---|---|---|---|---|---|---|
| | Return Rate | Quart Rank/ Percentile Rank | Return Rate | Quart Rank/ Percentile Rank | Return Rate | Quart Rank/ Percentile Rank |
| Am Gro Fd of Am R6 (RGAGX) | 38.28% | 2nd/35th | 28.54% | 4th/80th | -2.60% | 3rd/53rd |
| Baron Partners I (BPTIX 5/29/09) | 149.18% | 1st/1st | 45.38% | 1st/1st | -1.75% | 1st/16th |
| Baron Partners R6 (BPTUX 8/31/16) | 149.16% | 1st/1st | 45.38% | 1st/1st | -1.75% | 1st/16th |
| Van Gro Ind Adm (VIGAX 11/13/2000) | 40.19% | 2nd/28th | 37.23% | 1st/12th | -3.34% | 3rd/63rd |
| Fid Grow Co K (FGCKX 5/9/2008) | 67.69% | 1st/5th | 38.52% | 1st/7th | -4.46% | 3rd/73rd |
| Am Cen Ultra I (TWUIX 11/14/96) | 50.07% | 1st/12th | 34.90% | 2nd/29th | 0.86% | ist/21st |
| Fid OTC K (FOCKX) | 46.88% | 1st/16th | 39.38% | 1st/5th | -3.10% | 3rd/60th |
| Del Ivy LC Gro R6 (ILGRX (7/31/14) | 31.19% | 3rd/57th | 36.88% | 1st/14th | 2.51% | 1st/12th |

153.    Plan fiduciaries are responsible for applying a viable methodology when selecting and monitoring Plan investment options. Exacerbating the Swiss Re Defendants' imprudent choice to add and retain the JPM R5 TDFs, is the funds role as the Plan's QDIA for as long as it has been an option in the Plan investment menu.

Plan fiduciaries are responsible for the prudent selection and monitoring of an appropriate QDIA. The JPM R5 TDF with the target year that is closest to a participant's assumed retirement age (age 65) has served as the QDIA in the Plan throughout the pertinent period.

154.  Given the vast majority of plan participants in general, of which the Plan participants are no exception, are not sophisticated investors, they largely, by default, concentrate their retirement assets in TDFs. As such, the impact of the Swiss Re Defendants' imprudent selection of TDFs is magnified vis-à-vis other asset categories. Indeed, throughout the Class Period, approximately 15% of the Plan's assets were invested in the JPM R5 TDFs, with the percentage of total Plan assets located in the JPM R5 TDFs increasing by at least 1% per year.

155.  As previously discussed, measured against appropriate, available alternative TDF suites, the JPM R5 TDFs are a vastly inferior retirement solution. Throughout the Class Period, there were many available non-JPM R5 TDF suites that consistently and dramatically outperformed the JPM R5 TDFs, which would have become visible to the Swiss Re Defendants if they had applied a methodology fit for a fiduciary. The available non-JPM R5 TDF suites would have provided investors with the opportunity to achieve higher compounding returns, thus increasing the likelihood that Plan participants would reach their desired lifestyle in retirement. It is apparent, given the continued presence of the JPM R5 TDFs in the Plan's investment menu, that the Swiss Re Defendants failed to scrutinize the performance of the JPM R5 TDFs against any of the more appropriate alternatives in the TDF

marketplace. Accordingly, the Plan's investment in the JPM R5 TDFs has resulted in participants missing out on millions of dollars in retirement savings growth that could have been achieved through an investment in any of the proposed alternative TDFs discussed above, and indeed many other options.

156. A fiduciary that is acting with prudence, by applying viable methodologies in the sole interests of their plan participants, evaluates TDF and non-TDF returns not only against an appropriate index or a group of peer TDFs/non-TDFs, but also against specific, readily investable alternatives to ensure that participants are benefiting from the current investment offering.

157. Swiss Re's Plan would be categorized, at the very least, as "large," meaning its scale gave them access to the largest investment providers with the best performing investment offerings. As such, there were many alternative investment options that clearly outperformed the JPM R5 TDFs on an after-cost and risk basis throughout the Class Period, including, but not limited to, TRowe Price and Nuveen Lifecycle. On a relative basis, these investments would have been obvious comparators, as they all fall within the same Morningstar Category. *See supra* ¶89.

158. Over a 10 year period, JPM R5 TDFs only outperformed its Morningstar Category comparators 10 times out of 102 data points. Perhaps even more perplexing is the fact that the JPM R5 TDFs, over a 10-year period did not outperform their Nuveen Lifecycle counterpart once.

159.    Again, the Swiss Re Defendants had immediate access to historical and then-current returns data for the Plan's TDF and non-TDF investment options, and could have sought comparative data at any time.

160.    The Swiss Re Defendants, however, neglected to undertake an analysis of the Plan's suite of funds against appropriate peers using the above important performance metrics. Had the Swiss Re Defendants acted solely in the best interest of the Plan participants and weighed the benefits of the JPM TDFs against the available alternatives, they would have concluded that the J.P. Morgan options were far inferior and therefore an imprudent offering in the Plan's lineup of investment choices. This evidences a poor investment methodology.

161.    The Swiss Re Defendants' failure to utilize an adequate methodology when selecting and monitoring investments within the Plan caused Plan participants to miss out on millions in capital appreciation for their retirement savings.

### iii.    Failure to Use Plan Forfeiture Funds

162.    When employers make contributions to their employees' 401(k) accounts, like matching contributions or profit sharing, these contributions often come with a vesting schedule. If a plan participant leaves their job before becoming fully vested in the employer contributions, they forfeit any portion of the employer contribution that has not yet vested. The forfeited funds are then held in the plans "forfeiture account". Like all defined contribution plans, the Plan, maintains a forfeiture account in which employee's non-vested employer matching contributions are held when Plan participants leave their job.

163.   Under Section 404(a)(1)(D) of ERISA, 29 U.S.C. § 1104(a)(1)(d), fiduciaries are obligated to act "in accordance with the documents and instruments governing the plan."

164.   Under the Plan's Summary Plan Description ("SPD"), "any nonvested amounts … will be … forfeited to the Plan and *used* to reduce future employer contributions, restore forfeitures… or pay Plan expenses."

165.   Under 29 C.F.R. § 2510.3-102(a)(1), courts generally recognize that employer contributions become "plan assets" when paid into the plan. *Walsh v. Allen*, 3:17-CV-784-BJB, 2022 WL 256312, at *4 (WD Ky Jan. 26, 2022). As such, a plans forfeiture account is comprised of plan assets governed by the plan document.

166.   Pursuant to ERISA, "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1).

167.   Therefore, the Plan fiduciaries were obligated to *utilize* the Plan's forfeiture account pursuant to the Plan document, to either (1) pay reasonable Plan administrative expenses; (2) restore forfeitures; or (3) offset future employer contributions to the Plan. Failure to *utilize* the forfeiture account pursuant to the plan document is a per se ERISA violation.

| | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 |
|---|---|---|---|---|---|---|
| Forfeited Funds Available | $640,606 | $523,497 | $359,818 | $275,816 | $332,010 | $174,056 |
| Forfeited Funds Used to Reduce Employer Contributions | $2,300,885 | $1,205,405 | $1,200,000 | $1,000,000 | $1,000,000 | $900,000 |
| Forfeited Funds Used for Plan Expenses | $0 | $2,625 | $0 | $0 | $0 | $0 |
| Forfeited Funds held for Future Reinstatement | $0 | $45,865 | N/A | N/A | N/A | N/A |

168.    Despite utilizing *some* of the forfeited funds for employer contributions, according to the Plan's Form 5500s, Swiss Re has been consistently amassing funds in its forfeiture account throughout the Class Period. The funds located in a plan's forfeiture account are to be used and not accumulated and the transitional rule explicitly requires plan administrators to *use* forfeitures no later than 12 months after the close of the plan year in which the forfeitures are incurred.[29] As such, the accumulation of forfeiture funds is contrary to the spirit of the forfeiture account and Swiss Re must use the forfeited funds to pay Plan expenses, reduce its contributions, or allocate the funds as additional employer contributions. Swiss Re's actions to amass forfeiture monies is harming participants.

### iv.    *Empower and its Misuse of Participant Data*

169.    Empower is a subsidiary of EAICA, a company that has served customers for over 110 years. As of 2020, EAICA was the second largest retirement services company in the country, serving over 69,000 organizations. As of September

---

[29] REG-122286-18 (Mar. 13, 2023), https://www.irs.gov/irb/2023-11_IRB (accessed Feb. 18, 2025).

2024, EAICA administered over $1.7 trillion in plan assets. Empower has served as the Plan's recordkeeper for at least the past nine years.

170.    As the Plan's recordkeeper, Empower maintains records with respect to employees' accounts in the Plan, effectuates participant Plan investment elections, and performs administrative functions such as processing loans and withdrawal requests.

171.    As noted, Empower serves as recordkeeper to ERISA governed defined contribution plans. Although Empower's formal recordkeeping role involves certain ministerial tasks such as keeping track of participants' account balances, Empower abused its position and exceeded the bounds of its formal authority to exercise discretion and control over plans' management, operations, and administration.

172.    Data about a plan's participants is critical to the operation of a retirement plan. To accurately perform its recordkeeping function in a defined contribution plan, Empower received access to highly sensitive, confidential data about the plan's participants—e.g., age, length of employment, social security number, account balance, contact information, years until retirement age, and investment selections.

173.    However, Empower did not use this data solely to perform the ministerial tasks formally assigned to it. Instead, Empower improperly appropriated this confidential information, using its access to this confidential information to market Empower's ROTH IRAs, and thereby generated profits for itself at participants' expense.

174.   Upon information and belief, Empower preselected participants in Empower-administered plans. In other words, Empower used its position as the Plan's recordkeeper—and its access to confidential data about Plan participants—to identify promising high-asset targets and targeting people who were likely to move assets.

175.   Worse still, Empower exercised such discretion and control for the purpose of profiting at the expense of the Plans' participants, including Plaintiffs and Class members.

176.   Upon information and belief, Empower also concealed its employees' conflict of interest, requiring employees to falsely claim that their recommendations were "personalized" when in fact Empower's bonus structure created financial incentives to recommend Empower's ROTH IRA to participants leaving the Plan.

177.   Empower, failed to act in the sole interest of the Plan participants by providing the same advice to every targeted participant. In lieu of providing participants leaving the Plan with a tailored recommendation or a menu of options, including the choice to roll plan assets over to a tax-deferred account, Empower's initial and only recommendation to each such departing Plan participant was to roll their plan assets over to an Empower ROTH IRA.

178.   In or about March 2024, Plaintiff Michael Schlem spoke with Empower employee and registered broker, Alberto Andrado, regarding his Plan assets. During this call, Mr. Schlem informed Empower that he was leaving Swiss Re and wanted to know what his options were for his Plan assets. Mr. Andrado advised Mr. Schlem to

move his Plan assets to an Empower ROTH IRA. Mr. Schlem told Mr. Andrado that he would not be moving his Plan assets over to an Empower ROTH IRA because he could not afford the taxes associated with rolling over his Plan assets into a ROTH IRA.

179.    On March 8, 2024, Mr. Schlem was contacted again by Mr. Andrado to follow up on their conversation regarding moving Mr. Schlem's Plan assets. Mr. Andrado stated that he was "committed to providing personalized guidance" that could help address Mr. Schlem's retirement goals and that he was available to assist Mr. Schlem "in making an informed, appropriate choice."

180.    After their initial call, Empower called Mr. Schlem 10 more times to insist that he rollover his Plan assets to an Empower ROTH IRA.

181.    Upon information and belief, Empower continued to contact Mr. Schlem through September 24, 2024, insisting that he rollover his Plan assets to an Empower ROTH IRA.

182.    Plaintiff, Eileen Gillis experienced similar treatment after she contacted Empower to move her Plan assets. After speaking with Empower, she was targeted by Empower who solicited her numerous times thereafter to roll her Plan assets over to an Empower ROTH IRA.

183.    Upon information and belief, Empower has and continues to target Plan participants who are leaving their employer sponsored Plan in an effort to persuade them to roll their Plan assets over to an Empower ROTH IRA.

184.    Rather than serving participants' best interests exclusively, the recommendations to roll Plan assets over to an Empower ROTH IRA furthered the financial interests of Empower at the expense of participants. As Empower's employees did not even attempt to determine whether those recommendations were actually in participants' best interests.

185.    Contrary to Empower's false and misleading representations to participants, Empower's recommendations were not "personalized" and Empower's employees had profound conflicts of interest and significant financial incentives to recommend that participants rollover their Plan assets into an Empower ROTH IRA even though participants' interests would have been better served by remaining invested in their employer sponsored Plan or seeking alternative investments.

186.    Upon information and belief, Empower used an incomplete and misleading comparison of the pros and cons of rolling Plan assets to an Empower ROTH IRA compared to remaining in the Plans, rolling Plan assets over to an existing account, or moving the Plan assets elsewhere.

187.    Upon information and belief, Empower generally failed to inform participants of the cost of moving Plan assets to an Empower ROTH IRA compared to remaining in the employer-sponsored Plan, rolling Plan assets over to an existing account, or moving the Plan assets elsewhere.

188.    Upon information and belief, Empower discouraged its employees from providing alternative options to targeted Plan participants.

189.    Empower had no basis to conclude that Empower's ROTH IRAs would serve participants' best interests from a performance perspective.

190.    Upon information and belief, from 2019 through 2025, Empower had no comparative data showing that assets invested Empower's ROTH IRAs outperformed similarly allocated investments in employer sponsored plans, a tax-deferred account, or elsewhere.

191.    The conduct described above is ongoing.

### v.    *Failure to Monitor Empower's Cross-Selling Activities*

#### a.    Cross-Selling and Conflicts of Interest

192.    According to the Government Accountability Office ("GAO"), "cross-selling" is practice that occurs when "401(k) service providers… sell nonplan products and services, such as IRA rollovers, to participants outside their 401(k) plan…".[30]

193.    In its 2011 report titled "401(K) Plans Improved Regulation Could Better Protect Participants from Conflicts of Interest" (the "GAO Report"), the GAO recognized that such cross-selling activity may be a "conflict[ ] of interest," specifically:

> "Cross-selling products outside of a plan to participants can substantially increase a service provider's compensation, which creates an incentive for the service provider to steer participants toward the purchase of these products even though such purchases may not serve the participants' best interest. For example, products offered outside a plan may not be well suited to participants' needs or participants may be able to secure lower fees by choosing investment

---

[30] *401(K) Plans Improved Regulation Could Better Protect Participants from Conflicts of Interest*, U.S. GOVERNMENT ACCOUNTABILITY OFFICE at Page 36 (Jan. 2011) https://www.gao.gov/assets/gao-11-119.pdf (accessed Jan. 15, 2025)

funds within their plans comparable with products offered
outside their plan."

*Id.*

194.   The GAO noted that cross-selling activity can be mitigated by plan
sponsors when they "take steps to preclude service providers from cross-selling non-
plan products and services to plan participants," such as requiring the service
provider to sign a non-solicitation agreement. *Id.* at 36.

195.   In fact, sponsors of numerous defined contribution plans outside of the
proposed class have prevented recordkeepers from cross-selling investment products
and services outside of their plans through contract terms that prohibit cross-selling
and the use of participants' data for marketing or purposes other than administrative
and recordkeeping functions.

196.   Upon information and belief, at all relevant times during the Class
Period, Empower was soliciting participants leaving the Plan to rollover their Plan
assets to an Empower ROTH IRA.

197.   At all relevant times during the Class Period, Swiss Re was aware that
Empower had access to confidential Plan participant data, including, but not limited
to, their age, length of employment, account balance, contact information, and years
until retirement age.

198.   Swiss Re failed to mitigate Empower's cross-selling activities by failing
to require Empower to sign a non-solicitation agreement or in any way restrict
Empower's use of Plan participant's confidential data for purposes other than
administrative or recordkeeping functions.

199.    Further, at no time during the Class Period did Swiss Re require Empower to fully and adequately disclose its financial incentives and all information material to the ROTH IRA rollover decision. Information material to that decision would include, without limitation, comparisons of the fees that the participant would incur by executing that rollover versus another rollover, versus remaining invested in the Plan; comparative performance information; whether managed account services were available through the Plan; and the cost of such plan-based services compared to the cost of the service outside of the Plan.

b.    Monitoring all Sources of Empower's Revenue

200.    ERISA explicitly requires that administrative expenses and service provider compensation be "reasonable" for the services provided. See 29 U.S.C. §§ 1104(a)(1)(A)(ii), 1108(b)(2)(A). Thus, allowing a service provider to receive more than reasonable compensation constitutes both a fiduciary breach and a non-exempt prohibited transaction. 29 U.S.C. §§ 1104(a)(1)(A)–(B), 1106(a)(1)(C), 1108(b)(2)(A).

201.    To fulfill the obligation to ensure that a service provider receives no more than reasonable compensation, the fiduciary must account for all sources of compensation received by the service provider in connection with its services to the plan, including "indirect" compensation from sources "other than the covered plan[.]" See 29 CFR § 2550.408b-2(c)(viii)(B)(2) (defining "indirect compensation").

202.    If a fiduciary fails to quantify all sources of a service provider's compensation, it becomes impossible for the fiduciary to make a reasoned assessment

of whether the provider's total compensation is reasonable for its services to the plan, because the fiduciary does not know the total compensation.

203.    A prudent fiduciary knows or should have known that cross-selling could provide a substantial source of revenue to defined-contribution plan recordkeepers. For example, "a service provider could earn $6,000 to $9,000 in fees from a participant's purchase of an IRA, compared with $50 to $100 in fees if the same participant were to invest in a fund within a plan." GAO Report at 36.

204.    A fiduciary who fails to understand the significance of cross-selling revenues to a recordkeeper and to quantify such revenue loses the ability to use that information in negotiating the service provider's compensation. Conversely, a fiduciary who determines the amount of the recordkeeper's cross-selling revenues can use that information to negotiate a more favorable deal for the plan, reducing the costs paid by plan participants. Accordingly, the fiduciary who fails to account for cross-selling revenues necessarily causes its plan to incur unreasonable fees, because the same services could have been obtained at a lower cost if the fiduciary had diligently investigated the provider's cross-selling revenues and used that information for the plan's benefit.

205.    Upon information and belief, Swiss Re did not take Empower's cross-selling efforts into account when determining the reasonableness of Empower's recordkeeper fees.

206.    Further, upon information and belief, Swiss Re failed to use the fact that Empower was cross-selling its ROTH IRA products to Plan participants to leverage a better fee for the Plan.

207.    As a result of Swiss Re's failure to monitor Empower's cross-selling activities, Swiss Re caused the Plan to incur unreasonable fees.

## FIRST CAUSE OF ACTION
Excessive Recordkeeping Fees

208.    Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

209.    The Swiss Re Defendants are named fiduciaries or functional fiduciaries of the Plan. As such, the Swiss Re Defendants owed duties of loyalty and prudence to the Plan and the Plan participants.

210.    The Swiss Re Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that the Swiss Re Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.

211.    To the extent that any of the Swiss Re Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to his, her, their or its fiduciary status and/or knowingly failed to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

212.    Based on the facts described above, *see supra* ¶¶66-83; 118-136, throughout the Class Period, Swiss Re Defendants' breached their fiduciary duties by allowing the Plan to pay excessive recordkeeping service fees, resulting in a loss to the Plan and the Plan participants.

213.    Pursuant to Section 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, the Swiss Re Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of the Swiss Re Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## SECOND CAUSE OF ACTION
<u>Inclusion of Poor Performing Investments and Failure to Monitor Investment Performance</u>

214.    Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

215.    The Swiss Re Defendants are named fiduciaries or functional fiduciaries of the Plan. As such, the Swiss Re Defendants owed duties of loyalty and prudence to the Plan and the Plan participants.

216.    The Swiss Re Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that the Swiss Re Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.

217.    To the extent that any of the Swiss Re Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to his, her, their or its fiduciary status and/or knowingly failed to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

218.    Based on the facts described above, *see supra* ¶¶84-102; 137-161 throughout the Class Period, Swiss Re Defendants' breached their fiduciary duties by failing to use accepted methodologies when selecting investments to be included in the Plan, including poor performing investments in the Plan, and failing to monitor the performance of the investments included within the Plan, resulting in a loss to the Plan and the Plan participants.

219.    Pursuant to Section 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, the Swiss Re Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of the Swiss Re Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## THIRD CAUSE OF ACTION
Failure to Use Forfeiture Funds in Accordance with the Plan Document

220.    Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

221.    The Swiss Re Defendants are named fiduciaries or functional fiduciaries of the Plan. As such, the Swiss Re Defendants owed duties of loyalty and prudence to the Plan and the Plan participants.

222.    The Swiss Re Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that the Swiss Re Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's

participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.

223.   To the extent that any of the Swiss Re Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because they were a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to his, her, their or its fiduciary status and/or knowingly failed to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

224.   Based on the facts described above, *see supra* ¶¶ 103-107; 162-168 throughout the Class Period, Swiss Re Defendants' breached their fiduciary duties by failing to use Plan assets located in the Plan's forfeiture account pursuant to the Plan document, resulting in a loss to the Plan and the Plan participants..

225.   Pursuant to Section 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, the Swiss Re Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of the Swiss Re Defendants' breaches of fiduciary duty

and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

### FOURTH CAUSE OF ACTION
<u>Failure to Monitor the Recordkeeper</u>

226.   Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

227.   The Swiss Re Defendants are named fiduciaries or functional fiduciaries of the Plan. As such, the Swiss Re Defendants owed duties of loyalty and prudence to the Plan and the Plan participants.

228.   The Swiss Re Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that the Swiss Re Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.

229.   To the extent that any of the Swiss Re Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each

such Defendant is liable under 29 U.S.C. § 1105(a) as a co-fiduciary who knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of its specific responsibilities giving rise to its fiduciary status and/or knowingly failed to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

230.    Based on the facts described above, *see supra* ¶¶47-48; 192-207 throughout the Class Period, Swiss Re Defendants' breached their fiduciary duties by failing to prudently monitor Empower's misuse of participant data and Empower's cross-selling activity.

231.    Given Empower's access to sensitive Plan participant data, the Swiss Re Defendants should have requested certain confidentiality provisions, including a prohibition of misuse of participant data and on cross-selling activity, be included in its recordkeeping agreement with Empower.

232.    Pursuant to Section 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, the Swiss Re Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of the Swiss Re Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

### FIFTH CAUSE OF ACTION
Empower's Breach of Fiduciary Duties

233.    Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

234.    Under 29 U.S.C. § 1002(21)(A) a party is an ERISA fiduciary with respect to a plan to the extent:

> "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title."

235.    Pursuant to the Department of Labors final Retirement Security Rule, effective September 24, 2024 (the "Final Rule"), for the purpose of § 1002(21)(A)(ii), "a person renders 'investment advice' with respect to moneys or other property of a plan or IRA if the person makes a recommendation of any securities transaction or other investment transaction or any investment strategy involving securities … to a retirement investor …" and either:

> "(i) The person either directly or indirectly (e.g., through or together with any affiliate) makes professional investment recommendations to investors on a regular basis as part of their business and the recommendation is made under circumstances that would indicate to a reasonable investor in like circumstances that the recommendation is based on review of the retirement investor's particular needs or individual circumstances, reflects the application of professional or expert judgment to the retirement investor's particular needs or individual circumstances, and may be relied upon by the retirement investor as

intended to advance the retirement investor's best interest; or

(ii) The person represents or acknowledges that they are acting as a fiduciary under Title I of ERISA, Title II of ERISA, or both, with respect to the recommendation."

*See* 29 CFR § 2510.3-21.

236.    Under 29 CFR § 2510.3-21(f)(10)(iii), such recommendation includes a recommendation to "[r]oll[ ] over, transfer[ ], or distribut[ ] assets from a plan or IRA, including recommendations as to whether to engage in the transaction, the amount, the form, and the destination of such a rollover, transfer, or distribution."

237.    Under the Final Rule, a financial professional may no longer escape fiduciary liability in instances where they provide "one-time" advice, which is "often the most important advice the retirement investor will ever receive."[31]

238.    Based on the facts described herein, *see supra* ¶¶169-191,under the Final Rule, Empower acted as an ERISA fiduciary pursuant to 29 U.S.C. § 1002(21)(A)(ii) when it provided one-time advice to Plan participants regarding rolling over their plan assets to an Empower ROTH IRA.

239.    When acting as a fiduciary, Empower was required to act "solely in the interest of the participants and beneficiaries and for the exclusive purpose of

---

[31] *Employee Benefits Security Administration, Retirement Security Rule and Amendments to Class PTE for Investment Advice Fiduciaries*, U.S. DEPARTMENT OF LABOR, (Apr. 23, 2024) https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/retirement-security-rule-and-amendments-to-class-pte-for-investment-advice-fiduciaries (accessed Jan. 17, 2025); *see also* U.S. Department of Labor, Employee Benefits Security Administration. "Retirement Security Rule: Definition of an Investment Advice Fiduciary." 89 Fed. Reg. 32,150 (April 25, 2024) (The Final Rule "is intended to update the 'regular basis' prong of the 1975 regulation's five-part test to properly focus on persons who are in the business of providing investment recommendations, rather than defeating legitimate investor expectations by automatically excluding one-time advice from treatment as fiduciary investment advice.") (accessed Feb. 18, 2025).

providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan[.]" 29 U.S.C. §1104(a)(1)(A) (emphasis added). As such, Empower was obligated to act "with an eye single to the interests of the participants and beneficiaries." *See Rothstein v. Am. Intl. Group, Inc.*, 837 F3d 195, 208 (2d Cir 2016); *Donovan*, 680 F2d at 271.

240.    Further, under 29 U.S.C. §1104(a)(1)(B), Empower was required to act with "care, skill, prudence, and diligence" when formulating investment advice, meaning the advice must reflect a thorough and impartial investigation of the participant's options.

241.    The investment advice Empower rendered to Plaintiffs and Class members was neither prudent nor loyal. Based on the facts described above, Empower provided advice for the purpose of furthering its own financial interests. Thus, Empower, improperly using the confidential information it obtained about participants, intentionally steered participants to rollover their Plan assets to an Empower ROTH IRA because that was the more lucrative option for Empower, without regard for whether rolling-over Plan assets was in the participant's best or sole interest or otherwise prudent.

242.    As a result of these breaches of fiduciary duties, Empower is liable for all losses suffered by Plaintiffs and Class members under 29 U.S.C. §1109(a), §1132(a)(2), and §1132(a)(3). Further, any of Empower's profits made through the use of Plan assets or realized as a result of its breaches of the fiduciary duty are subject

to disgorgement or a constructive trust. *See Harris Tr. and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 US 238, 250 (2000).

## SIXTH CAUSE OF ACTION
### ERISA Prohibited Transactions

243.    Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

244.    29 U.S.C. § 1106(b) prohibits self-dealing transactions between a plan and a fiduciary. Specifically, a plan fiduciary shall not:

> "(1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party … whose interests are adverse to the interests of the plan … its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

29 U.S.C. § 1106(b).

245.    Based on the facts described above, *see supra* ¶¶169-191, Empower was a fiduciary when it rendered investment advice and recommendations that Plaintiffs and Class members roll assets from their employee benefit Plan accounts to an Empower ROTH IRA, which increased Empower's compensation and profits. In so doing, Empower dealt with the assets of the Plan in its own interest or for its own account, in violation of 29 U.S.C. §1106(b)(1); acted in a transaction involving the Plan on behalf of a party whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2); and received consideration for its own personal account from parties dealing with the Plan in

connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

246.   29 U.S.C. § 1106(a) prohibits transactions between a plan and a party in interest. Section 1106(a)(1) provides that:

> "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

247.   Pursuant to 29 U.S.C. § 1002(14), a "party in interest" includes (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

248.   29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

249.   Based on the facts described above, Empower is a party in interest because it is a fiduciary of the plan and provides services to the plan as the plan's recordkeeper. *See* 29 U.S.C. §1002(14)(A) and (B). By rendering investment advice and recommendations that Plaintiffs and Class members roll assets from their employee benefit Plan account to an Empower ROTH IRA, thus increasing Empower's compensation and profits, Empower caused the Plan to engage in transactions which they knew or should have known constituted an exchange of

property between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(A); engage in transactions which they knew or should have known constituted the furnishing of services between the Plan and a party in interest in violation of 29 U.S.C. §1106(a)(1)(C); and engage in transactions which they knew or should have known constituted a transfer of Plan assets to a party in interest in violation of 29 U.S.C. §1106(a)(1)(D).

250. Based on the facts described above, no statutory or regulatory exemption is available to relieve Empower from liability for these prohibited transactions. Among other reasons, the investment advice that is the subject of this claim was not the result of an impartial recommendation or a prudent investigation of participants' options, and the transactions provided Empower with unreasonable compensation.

251. To the extent Empower is not a plan fiduciary, Empower, as a party in interest may be held liable for knowing participation in these violations of 29 U.S.C §§ 1106(a)(1)(C) and (D) pursuant to 29 U.S.C. § 1132(a)(3) regardless of whether they were ERISA fiduciaries.

252. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Empower, as a plan fiduciary, is liable to restore to the plan all losses caused by Empower's violations of 29 U.S.C. §§ 1106(a)(1)(C),(D) and 1106(b).

253. As a result of these prohibited transactions, Empower is liable for all losses suffered by Plaintiffs, Class members, and their respective plans under 29 U.S.C. §1109(a), §1132(a)(2), and §1132(a)(3). Further, all of Empower's profits made

through the use of the Plan assets or realized as a result of these self-dealing and otherwise prohibited transactions are subject to disgorgement or a constructive trust. *See Harris Tr. and Sav. Bank*, at 250.

### SEVENTH CAUSE OF ACTION
<u>Empower Knowingly Participated in the Swiss Re Defendant's ERISA violations</u>

254.    Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

255.    Under 29 U.S.C. § 1132(a)(3), the court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA.

256.    This statute applies to both plan fiduciaries and non-fiduciaries. *See Harris Tr. and Sav. Bank*, 530 US 238 at 239 ("While § 502(a)(3) does not authorize "appropriate equitable relief" at large, but only for the purpose of "redress[ing any] violations or ... enforc[ing] any provisions" of ERISA or an ERISA plan, e.g., … , the section admits of no limit … on the universe of possible defendants. Indeed, § 502(a)(3) makes no mention at all of which parties may be proper defendants—the focus, instead, is on redressing the "act or practice which violates any provision of [ERISA Title I].").

257.    Thus a defendant may be held liable under 29 U.S.C. § 1132(a)(3), even if it is not an ERISA fiduciary, if the defendant "knowingly participates" in an ERISA fiduciary's violation. *See Carfora*, at *5.

258.    The Swiss Re Defendants are named fiduciaries or functional fiduciaries under ERISA based on, among other things, being named in the plan as a fiduciary and hiring Empower as their plans' recordkeeper. As such, the Swiss Re Defendants

owed duties of loyalty and prudence to the Plan and the Plan participants, and were bound by ERISA's prohibited transactions provisions, which render per se unlawful certain transactions between their Plan and party-in-interest service providers like Empower.

259.    Based on the facts described above, *see supra* ¶¶ 169-207, the Swiss Re Defendants breached their fiduciary duties in at least the following respects:

a.  Failing to protect Plaintiffs and Class members' interests and those of the Plan by allowing or failing to monitor Empower's cross-selling efforts;

b.  Failing to take steps to protect Plaintiffs and Class members by preventing Empower's misuse of confidential participant data to benefit themselves;

c.  Failing to protect the interests of Plaintiffs and Class members by failing to mandate that Empower fully disclose conflicts of interest and other information material to the rollover decision to Plan participants;

d.  Failing to inquire into Empower's revenues derived from cross-selling; and

e.  Failing to monitor and account for the amount of Empower's revenues derived from cross-selling to evaluate whether Empower's compensation was reasonable for the services provided to the plan(s).

260.    Had the Swiss Re Defendants discharged their ERISA obligations, Empower either would have been prevented from engaging in the conduct described herein, or the harmful effects of that conduct would have been mitigated.

261.    Empower knew that their own conduct described herein was unlawful. Empower also knew of the circumstances that rendered the Swiss Re Defendants' conduct a breach of fiduciary duties and the circumstances that rendered the transactions involving their services, transfers, and use of Plan assets unlawful. Empower knew that the Swiss Re Defendants were not monitoring or restricting its cross-selling activities, requiring full disclosure of material information including conflicts of interest, inquiring into the amount of Empower's cross-selling revenues derived from their plans, or implementing other measures to protect the plans' participants from misuse of their confidential information and predatory sales tactics.

262.    As a result of its own misconduct and Swiss Re Defendants' ERISA violations, Empower knowingly received Plan assets or improper profits derived from Plan assets. These assets and profits rightfully belong to the Plaintiffs and Class members.

263.    An ERISA fiduciary's duty is derived from the common law of trusts. *See Tibble*, 575 US at 528. As such, "it has long been settled that when a trustee in breach of his fiduciary duty to the beneficiaries transfers trust property to a third person, the third person takes the property subject to the trust, unless he has purchased the property for value and without notice of the fiduciary's breach of duty. The trustee or beneficiaries may then maintain as action for restitution of the property (if not

already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom." *Harris Tr. and Sav. Bank*, 530 US 238 at 250, *citing* Restatement (Second) of Trusts §§ 284, 291, 294, 295, 297 (1957).

264.    Thus, even if Empower was not an ERISA fiduciary, Empower remains subject to equitable remedies under 29 U.S.C. § 1132(a)(3), such as restitution, disgorgement, or constructive trust.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demands judgment against Defendants, for the following relief:

   a. Declaratory and injunctive relief pursuant to Section 502 of ERISA, 29 U.S.C. § 1132, as detailed above.

   b. Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to Sections 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132.

   c. Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity.

   d. Attorneys' fees, costs and other recoverable expenses of litigation.

   e. Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## JURY DEMAND

Plaintiffs demand a jury trial with respect to all claims so triable.

## NOTICE PURSUANT TO ERISA § 502(H)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated:      February 19, 2025
            New York, NY

                                Respectfully submitted,
                                **Sedhom Law Group, PLLC**

                        By: _____
                                Rania V. Sedhom (RS5439)
                                630 Fifth Avenue, Suite 2508
                                New York, NY 10111
                                212-664-1600 (tel.)
                                212-563-9280 (fax)
                                rsedhom@bespokelawfirm.com
                                *Attorneys for Plaintiffs and the*
                                *Proposed Class*