## United States District Court
### Southern District of New York

Nia Rudasill, Eileen Gillis, Michael Schlem, and Robert Vuoto, individually and as representatives of a class similarly situated persons, on behalf of the Swiss Re Group U.S. Employees' Savings Plan,

<em>Plaintiffs</em>,

v.

Swiss Re American Holding Corporation, the Board of Directors of the Swiss Re American Holding Corporation, Philip K. Ryan, Larry Zimpleman, the Swiss Re American Holding Corporation Employee Pension Plan Committee, Great-West Lifeco Inc., Great-West Lifeco U.S. LLC, Empower Annuity Insurance Company of America, Empower Retirement, LLC, Empower Trust Company, LLC, and Does No. 1-10, whose names are currently unknown,

<em>Defendants</em>.

Case No. 1:25-cv-01403-ALC

The Honorable Andrew L. Carter Jr.

**Plaintiffs' Memorandum in Opposition to the Swiss Re Defendants' Motion to Dismiss**

**Oral Argument Requested**

Respectfully submitted,

**Sedhom Law Group, PLLC**
630 Fifth Avenue, Suite 2508
New York, NY 10111
212-664-1600
*Attorneys for Plaintiffs*

**Contents**

Preliminary Statement ............................................................................................................. 1

Background .............................................................................................................................. 2

I.  The Parties .................................................................................................................... 2

II.  Defined Contribution Plans ........................................................................................ 2

III.  Between 2016 and 2023, Plan participants paid between $4.8 million and $7.5 million more in recordkeeping and administrative fees than participants in plans of similar size. 3

IV.  Swiss Re selected and retained imprudent investment options. ...................................... 4

A. ..... Modern Portfolio Theory, which is validated by the Uniform Prudent Investment Act, helps fiduciaries select and retain prudent investment options for defined contribution plans. ........................................................................................................ 4

B. . Swiss Re selected and retained investment options with unreasonably high expense ratios. ................................................................................................................................ 5

C. Swiss Re selected and retained investment options that consistently underperformed compared to their comparators. ........................................................................................ 6

V.  Swiss Re misuses the funds in the Plan's forfeiture account. ........................................ 7

VI.  Swiss Re gave Empower unrestrained access to Plan participants' personal information. 8

Argument ................................................................................................................................ 8

I.  Standard of Review. ..................................................................................................... 8

II.  Swiss Re's Duty of Care. ............................................................................................. 9

III.  The Plaintiffs adequately plead their recordkeeping claims (Counts I and IV) ............... 9

IV.  The Plaintiffs adequately plead their imprudent investment options claims (Count II) 12

V.  The Plaintiffs adequately allege their forfeiture accounts claims (Count III) ................ 18

VI.  This Court should grant the Plaintiffs leave to file an amended complaint if it finds any of their claims deficient. ................................................................................................. 19

Conclusion ............................................................................................................................ 20

## Cases

*American Stores Co. v. C.I.R.*, 170 F.3d 1267 (10th Cir. 1999) ....................................... 9
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................. 8
*Becerra v. Bank of Am. Corp.*, No. 3:24-cv-921-MOC-DCK (W.D.N.C. Aug. 12, 2025) .......... 19
*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ................................. 8, 12
*Chill v. Calamos Advisors LLC*, 175 F. Supp.3d 138 (S.D.N.Y. 2016)........................... 15
*DigitAlb, Sh.a v. Setplex*, LLC, 284 F. Supp. 3d 547 (S.D.N.Y. 2018) ......................... 19
*Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982)........................................................ 1
*Foman v. Davis*, 371 U.S. 178 (1962)............................................................................ 19
*In re Omnicom ERISA Litig.*, 2021 WL 3292487 (S.D.N.Y. 2021) ............................... 16
*In re Quest Diagnostics Inc. ERISA Litig.*, 2021 WL 1783274 (D.N.J. May 4, 2021) .................. 9
*Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. Am. Co.*, 195 F.3d 765 (5th Cir. 1999) .................................................................................................................. 19
*Nicolas v. Trustees of Princeton Inv.*, 2017 WL 4455897 (D.N.J. Sept. 25, 2017)...................... 15
*Sacerdote v. New York University*, 9 F.4th 95 (2021)........................................... passim
*Silva v. Evonki Corp.*, 2020 WL 12574912 (D.N.J. Dec. 30, 2020) ............................. 15
*St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013) ...................................................................................................... 12
*Stewart v. Nextera Energy*, No. 23-81314-CIV-CANNON (S.D. Fla. Aug. 14, 2025).................. 9
*Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863 (5th Cir. 2000)................................. 19
*Tibble v. Edison Int'l*, 575 U.S. 523 (2015) ..................................................................... 9
*Tibble v. Edison Int'l*, 843 F.3d 1187 (9th Cir. 2016) ................................................... 17
*Trustees of Upstate N.Y. Engr's Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561 (2d Cir. 2016). 17
*Vellali v. Yale Univ.*, 2022 WL 13684612 (D. Conn. Oct. 21, 2022)............................ 17

## Statutes

29 C.F.R. § 2550.408b-2 ............................................................................................. 3, 10
29 U.S.C. § 1104(a)(1)(A) ........................................................................................... 1, 9
Fed. R. Civ. P. 15(a)(2) .................................................................................................. 19
Fed. R. Evid. 102(b)......................................................................................................... 9

PRELIMINARY STATEMENT

Swiss Re[1] costs the participants of its Swiss Re Group U.S. Employees' Savings Plan millions of dollars every year. While that may mean nothing to Swiss Re, it means that many Plan participants and their beneficiaries can't enjoy the retirements they've worked for their entire working lives. Swiss Re's poor methodologies decrease the likelihood that many Plan participants reach their preferred lifestyle in retirement. The named Plaintiffs now fight to get their golden years back, for themselves and for the other Plan participants who have lost a tremendous amount of money trusting Swiss Re's choices about their retirement savings.

Under the Employee Retirement Income Security Act of 1975 (ERISA), the Plan's fiduciaries must perform its duties solely in the interest of Plan participants and their beneficiaries. *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)(citations omitted). As part of that duty, they must defray reasonable expenses to administer the Plan. 29 U.S.C. § 1104(a)(1)(A)(i)-(ii). This is a high standard: An ERISA fiduciary must avoid doing things that "will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Donovan*, 680 F.2d at 271.

Swiss Re breached its duties to the Plan participants and their beneficiaries. It allowed the Plan to pay between three and seven times more in recordkeeping and administrative fees than other similar plans. It selected investment options that grossly underperformed the comparator funds in the same Morningstar categories and failed to replace them with higher-returning funds. Rather than use the Plan's forfeiture funds properly, it stockpiles the money, leaving participants with higher fees. And it failed to monitor Empower's[2] use of participant confidential information, which has allowed Empower to engage in improper cross-selling activities.

---

[1] "Swiss Re" means Defendants Swiss Re America Holding Corporation, its Board of Directors, Philip K. Ryan, Larry Zimpleman, and the Swiss Re American Holding Corporation Employee Pension Plan Committee. ECF No. 68 at 1.
[2] Plaintiffs dismissed the other Empower defendants, Great-West Lifeco Inc., Great-West Lifeco U.S. LLC, Empower Annuity Insurance Company of America, and Empower Trust Company, LLC, as a courtesy to taxpayers and to streamline the case, with Empower Retirement, LLC agreeing to take on all responsibility for the dismissed Empower defendants. This dismissal does not affect the validity of the claims against Empower.

In its motion to dismiss the Complaint, Swiss Re tries to misdirect the Court by:

- o   asking the Court to read the Complaint in isolation;

- o   mischaracterizing, or failing to accept as true, all of the Complaint's allegations;

- o   inadequately explaining the Plan's revenue share model to the Court; and

- o   ignoring the high fiduciary standard placed upon it by ERISA.

Despite these tactics, if the Court reads the Complaint in the aggregate, with the understanding that even small return or expense differences can drastically impact, over the years, a participant's retirement, then it can only conclude that the Plaintiffs have plausibly alleged their claims.

**BACKGROUND**

### I.    The Parties

The Plaintiffs are former Plan participants. Compl. ¶ 1. Swiss Re maintains it, and must select, monitor, and retain services providers to help operate it. *Id.* ¶ 4. Swiss Re retained Empower to serve as the Plan's recordkeeper. *Id.*

### II.    Defined Contribution Plans

The Plan is a defined contribution plan subject to ERISA. *Id.* ¶ 108. As of year's end, 2023, it held approximately $1.45 billion in assets and provided retirement income for more than 4,000 participants, which places it in the top 0.1% of all defined contribution plans by size. *Id.* ¶¶ 5, 109.

Plan participants bear the risk of high fees and underperformance of their investments, both of which are impacted by compounding. Compl. ¶ 2. For example, a 1% higher fee over 30 years makes a 28% difference in retirement assets. *Id.*[3]

---

[3] Swiss Re did not dispute these statistics. The Court can, therefore, presume that Swiss Re agrees that a 1% difference in costs and fund performance is significant.

Swiss Re selects and reviews the investment options available to Plan participants. *Id.* ¶¶ 84, 99. Although participants of defined contribution plans receive many documents and disclosures related to their plan, they don't receive information sufficient to determine the Plan fiduciaries' decision-making process. *Id.* ¶¶ 100-102.

### III. Between 2016 and 2023, Plan participants paid between $4.8 million and $7.5 million more in recordkeeping and administrative fees than participants in plans of similar size.

"Recordkeeping" is a catch-all term for the suite of recordkeeping and administrative services provided to a plan by its service providers that relate to plan administration, monitoring participant and beneficiary transactions, and maintaining accounts, records, and statements. 29 C.F.R. § 2550.408b-2. These services are uniform in nature and include recordkeeping, website maintenance, and call center support. Compl. ¶¶ 77-79, 83, 119.[4] Recordkeepers also provide rollover advice through their wholly-owned subsidiaries that employ investment advisors. *Id.* ¶ 76.

Recordkeepers get paid directly from plan assets or indirectly through revenue sharing payments collected by the investment provider. *Id.* ¶ 73. They typically offer discounted recordkeeping services if a plan also buys non-recordkeeping services like investment management, which can double or triple their revenue from the plan. *Id.* ¶ 76.[5] In addition, fiduciaries of large plans like the Plan can negotiate lower per-participant fees because a recordkeeper's costs decrease as the number of participants increases. *Id.* ¶¶ 78-79. Fiduciaries must negotiate for lower fees and ensure that per-participant fees decrease as plan size grows. *Id.* ¶¶ 79, 81.

The Plan is particularly attractive to recordkeepers because of its high asset-to-participant ratio. *Id.* ¶ 133. Swiss Re nevertheless failed to leverage its bargaining power to obtain low recordkeeping fees for the Plan. On the contrary: the Plan charged between $246.58 and $295.10

---

[4] Empower, in its memorandum in support of its motion to dismiss, admits that recordkeeping services are "standard" and "run-of-the-mill". ECF No. 65 at 23.

[5] Swiss Re selected Advised Asset Group, LLC to, amongst other things, earn money from investment services. Advised is owned by Empower.

per participant between 2018 and 2023. *Id.* ¶ 124. According to a 2024 survey by Encore Fiduciary,[6] one of the leading providers of fiduciary insurance to large plans across the United States, that's more than:

- o seven times the average for plans with between $1 billion and $5 billion in assets;

- o five times the average for plans with between 2,500 and 5,000 participants; and

- o three times the per-participant cost of the highest 10% of plans with between 2,500 and 5,000 participants.

*Id.* ¶ 125. That's also significantly more than participants pay in specific plans of similar size to the Plan. *Id.* ¶¶ 131-132. Plan participants have paid between $4.8 million and $7.5 million more than the average for similarly sized plans between 2016 and 2023. *Id.* ¶¶ 127-129.

In addition, Swiss Re failed to consider the money Empower earns as part of its cross-selling activities (see *infra* at 8, 12) to negotiate lower recordkeeping rates for Plan participants, which is legally prudent to do. Compl. ¶¶ 200-206.

## IV. Swiss Re selected and retained imprudent investment options.

### A. Modern Portfolio Theory, which is validated by the Uniform Prudent Investment Act, helps fiduciaries select and retain prudent investment options for defined contribution plans.

ERISA fiduciaries must develop a method for selecting their plan's investment options. *Id.* ¶ 84. They can use modern portfolio theory to gain insight on the risk, return, and volatility of candidate investments. *Id.* ¶ 86. They can also use it to compare their candidates with alternative options. *Id.* Key data points include the following:

- o **Standard Deviation.** Higher numbers suggest greater volatility.

- o **Sharpe Ratio.** A higher ratio suggests a better risk-adjusted return.

---

[6] Daniel Aronowitz, Encore's President, was approved by the Senate Committee to head the Employee Benefits Security Administration in June 2025.

      ○   **Information Ratio.** A higher ratio suggests a more skilled investment manager and potentially better investment value.

*Id.* ¶ 87.

Morningstar is the primary tool for investment research. *Id.* ¶ 88.[7] Its advanced filter systems allow fiduciaries to make an "apples-to-apples" comparison of candidate investment options. *Id.* ¶ 89. Investments in the same Morningstar categories have similar risk, return, and behavior profiles. *Id.*

Swiss Re chose the J.P. Morgan Smart Retirement Target Date Fund, share class R5 (the "JPM R5 TDF") as the Plan's qualified default investment alternative, which means that if a participant does not select a specific fund to invest in, they will automatically invest in the JPM R5 TDF with a target date that is closest to the year in which the participant will reach retirement age. *Id.* ¶ 116. Most participants don't select specific funds and therefore invest in this option by default. *Id.* ¶ 154. Throughout the Class Period, approximately 15% of the Plan's assets were in these funds, with the percentage of total Plan assets located in them increasing by at least 1% per year.

For the reasons below, there's no statistical evidence that Swiss Re used modern portfolio theory or any other acceptable methodology to review, select, or maintain the Plan's investment options. Instead, as evidenced below (see *infra* at 6-7, 12-17), Swiss Re used a flippant "set-it-and-forget-it" approach to fund selection.

## B. Swiss Re selected and retained investment options with unreasonably high expense ratios.

Institutions can invest in institutional share classes of mutual funds. *Id.* ¶ 95. Institutional share classes, designated as "R" classes, range from R1 to R6. *Id.* All of these classes are composed of identical investments, but the R6 share class is the cheapest option and carries a lower "expense ratio". *Id.* ¶ 94. An expense ratio measures how much of a fund's assets are used for administrative

---

[7] Morningstar is the leading research tool for those in the finance industry analyzing mutual funds, Collective Investment Trusts (CITs), and Separately Managed Accounts (SMAs). Most other financial technology research tools overlay statistics that are provided by Morningstar.

or other operating expenses.[8] A fund's expense ratio directly impacts investment returns. *Id.* ¶ 97. If a participant invests in a fund that carries a 0.50% higher expense ratio than an alternative, they could lose out on $153,325.98[9] in account accumulation over a ten-year period. *Id.* ¶ 98. If the average participant loses out on $153,325.98, the total damage is $657,461,802.24.

Because of its lower cost, R6 funds always yield higher returns than their more expensive counterparts. Fiduciaries acting in the sole interest of their plan's participants will therefore opt for the R6 when available. *Id.* ¶ 142.

Given its size, the Plan easily qualifies for R6 shares. *Id.* ¶¶ 95, 140. Swiss Re nevertheless opted for the R5 share class over the cheaper and better-returning R6. *Id.* ¶ 129. Between 2018 and 2023, that choice has cost Plan participants $1,253,076 in lost returns. *Id.* ¶ 141. In 2023 alone it cost participants nearly a quarter-million dollars. *Id.* These damages will only get worse because of the effect of compounding.

### C. Swiss Re selected and retained investment options that consistently underperformed compared to their comparators.

After selecting investment options, ERISA fiduciaries must gauge performance to determine whether they are keeping up with other options in their peer groups. *Id.* ¶ 149. One appropriate measure is the "quartile rank," which measures how well an investment has performed against others in its Morningstar Category, which allows for an apples-to-apples comparison because of Morningstar's advanced filtering systems. *Id.* ¶¶ 89, 149.

The JPM R5 TDFs grossly underperformed their comparators. The JPM R5 TDFs for retirement years between 2025-2060 were in the bottom 50% of their Morningstar categories almost half the time. *Id.* ¶¶ 149-150. Even in years where the funds ranked in the top half, they

---

[8] *Expense Ratio*, Investopedia (May 17, 2025), https://www.investopedia.com/terms/e/expenseratio.asp (accessed August 20, 2025).

[9] The average annual salary for U.S.-based Swiss Re employees is $94,000, plus a $12,000 bonus. *Average Salary for Swiss Re Employees*, Payscale.com, https://www.payscale.com/research/US/Employer=Swiss_Re/Salary (accessed Aug. 21, 2025). Over ten years, that $153,325.82 represents nearly 15% of average annual salary for Swiss Re employees. Certainly, that is not an insignificant statistic.

failed to beat their Morningstar comparators. *Id.* The Plan's non-TDF funds fared no better. *Id.* ¶ 152.

In addition, the JPM R5 TDFs for retirement years 2030, 2040, and 2050 all had worse Sharpe Ratios and Information Ratios than most of their comparators. *Id.* ¶ 91. This means that the comparators had better risk-adjusted returns, more skillful investment managers, and potentially better investment value.

Swiss Re had immediate access to the historical and then-current return data for the JPM R5 TDFs but nevertheless failed to properly analyze them or analyze them at all. *Id.* ¶ 159. Nothing suggests that Swiss Re used modern portfolio theory or any other viable methodology to select and retain the JPM R5 TDFs. Had it done so, it would have removed them in favor of prudent and reasonable alternatives, like the funds' comparators. *Id.* ¶ 139. Better funds yield better returns, which means Plan participants earn more money for their retirement. Rather, Swiss Re's inaction is either negligent or lazy. Either way, its inaction runs afoul of ERISA's duty of prudence.

### V.    Swiss Re misuses the funds in the Plan's forfeiture account.

The Plan maintains a forfeiture account that holds unvested portions of a participant's employer contributions. Compl. ¶ 162. This money must be held exclusively to benefit Plan participants and defray administrative costs, and must be used in accordance with the Plan Document. 29 U.S.C. § 1104(a)(1)(d). The Plan's Summary Plan Description states that the forfeiture account must be used to reduce future employer contributions, restore forfeitures, or pay Plan expenses. Compl. ¶¶ 164, 167. The Plan also states that forfeitures shall be used for those purposes. ECF No. 68-9 at 34.

Between 2018 and 2023, Swiss Re spent $7.6 million dollars from the Plan's forfeiture account to reduce future employer contributions. *Id.* ¶ 167. It used only $2,625 to pay Plan expenses, and that happened only once. *Id.* In addition, rather than use all of the funds, Swiss Re's stockpiled those funds. *Id.* ¶¶ 167-168. This accumulation not only violates the Plan Document,

but also violates the spirit of ERISA, which mandates that fiduciaries use the forfeiture fund exclusively for the benefit of plan participants.

## VI. Swiss Re gave Empower unrestrained access to Plan participants' personal information.

Cross-selling occurs when a service provider, like Empower, sells non-plan products and services to participants outside of their plan *Id.* ¶ 192. Because cross-selling can create conflicts of interest, plan sponsors should take steps to preclude this activity by, for example, requiring the service provider to sign a non-solicitation agreement. Compl. ¶¶ 193-195.

Empower used Plan participants' confidential information to solicit them to rollover their Plan assets to an Empower ROTH IRA when they left the Plan. *Id.* ¶ 196. Swiss Re knew this was happening but did nothing to stop or restrict it. *Id.* ¶¶ 197-199.

ARGUMENT

## I. Standard of Review.

A complaint will survive a motion to dismiss if it contains sufficient factual allegations that state a claim of relief that is plausible on its face. *Sacerdote v. New York University*, 9 F.4th 95, 106 (2021)(*citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Courts must construe the allegations liberally, "accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Id.* at 106-107 (citations omitted). In addition, a complaint should be read as a whole, "not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

Because "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences," a claim "may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct." *Sacerdote*, 9 F.4th at 107 (quotations and citations omitted).

II.    **Swiss Re's Duty of Care.**

In acting for the sole purposes of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering their plans, 29 U.S.C. § 1104(a)(1)(A)(i)-(ii), ERISA fiduciaries must discharge their duties with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Sacerdote*, 9 F.4th at 107. This standard applies to the selection, monitoring, and removal of investment options. *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). It focuses on the fiduciary's conduct in arriving at an investment decision and asks whether the fiduciary "employed the appropriate methods to investigate and determine the merits of particular investment." *Id.* (citations omitted).

III.   **The Plaintiffs adequately plead their recordkeeping claims (Counts I and IV).**

Swiss Re argues that the Plaintiffs: (1) haven't alleged that the Plan's recordkeeping fees were excessive related to the services rendered, and (2) improperly calculated the Plan's recordkeeping fees. ECF No. 67. None of those arguments meet the requirements to grant its motion. The Plaintiffs allege that the Plan paid excessive recordkeeping fees and that Swiss Re failed to use its negotiating power to secure lower rates. This is all that's required to survive a motion to dismiss. *Stewart v. Nextera Energy*, No. 23-81314-CIV-CANNON (S.D. Fla. Aug. 14, 2025)*; In re Quest Diagnostics Inc. ERISA Litig.*, 2021 WL 1783274 (D.N.J. May 4, 2021). Specifically, the Plaintiffs alleged that recordkeeping services are uniform in nature and include recordkeeping, website maintenance, and call center support. Compl. ¶¶ 77-79, 83, 119. Publicly available recordkeeping agreements that Empower and other recordkeepers execute with governments and governmental agencies[10] confirm this uniformity.[11] *See, for example*,

---

[10] Recordkeeping agreements with private companies are not publicly available.
[11] The Court can take judicial notice of these documents. They are publicly available and "capable of accurate and ready determination." *American Stores Co. v. C.I.R.*, 170 F.3d 1267, 1270 (10th Cir. 1999)(*citing* Fed. R. Evid. 102(b)).

Exhibit 3 at § 4; Exhibit 4 at § 7; Exhibit 5 at Article II; Exhibit 6 at Schedule B-1. Without having the contracts between each plan and its recordkeeper, plaintiffs cannot possibly state exactly what services a plan receives. As such, requiring the Plaintiffs to provide that information at this stage would violate the absurdity doctrine.[12]

The Plaintiffs also allege that "recordkeeping" includes all recordkeeping and administrative services. Compl. ¶ 67; *see also* 29 C.F.R. § 2550.408b-2 (stating that "recordkeeping services" includes services related to plan administration). They therefore properly compared all of the Plan's recordkeeping and administrative services to all of the recordkeeping and administrative services of similar-sized plans. The Plan paid, for example, $274.06 per participant in these fees in 2023. *Id.* ¶ 124. That's more than seven times higher than the average for plans holding $1-5 million in assets, and more than five times higher than the average for plans with 2,500-5,000 participants. *Id.* ¶¶ 120, 125. Between 2016 and 2023, Plan participants paid between $4.8 million and $7.5 million more than average. *Id.* ¶¶ 127-129. In addition, Plan participants paid between $77.17 and $266.50 more than participants of the 19 comparator plans did in 2023. *Id.* ¶¶ 131-132.

In addition to the $274.06 that each Plan participant pays directly, one must consider the unallocated revenue credits in the Plan's spending account. Revenue credits are rebates that participants receive when they invest in the JPM R5 TDF. Before allocation, those monies are held in the Plan's spending account. According to the Plan's 2023 Form 5500, "[a]s of December 31, 2023 and 2022, the balance in the ERISA spending account is $877,273 and $1,022,522, respectively, which are included in total investments per the Statements of Net Assets Available for Benefits." ECF No. 68-5 at 34. The Form also states that "[t]he Plan shall credit all revenue sharing received by the Plan to the accounts of those participants who had a balance in the fund

---

[12] Swiss Re's assertion, on page 18 of its Memorandum, that the Plaintiffs failed to specifically name service providers who could have provided similar services to the Plan highlights this fallacy of logic. A Plan participant cannot seek Requests For Proposal (RFPs) from services providers.

that paid the revenue sharing amount." *Id.* Had Swiss Re credited all money in the spending account, each participant would have received $204.59.[13]

Added to the $40 that Swiss Re claims participants paid for recordkeeping fees, the per-participant charge is $244.59. Added to the $274.06 that the Plaintiffs allege, that's a per-participant charge of $518.65. Either total is grossly higher than the average fee that participants in other plans pay.

Another issue with Swiss Re's revenue credit argument is that timing of the allocations is uncertain. Equally enigmatic are responses to the below questions that arise as a direct result of Swiss Re's disclosures:

- o From which years, and for how many years, are spending account balances carried over?

- o How were the revenue sharing fees paid?

- o To whom (if at all) did Swiss Re pay the unallocated balance in the next year?

- o Did Swiss Re use the unallocated funds to decrease future costs incurred by plan participants?

- o How much in earnings would those monies create for plan participants, had they been returned to them or, better yet, not charged to them in the first place?

- o How does the plan allocate monies to participants who've left the Plan?

Unless the timing of the credits' allocation is perfect, Plan participants are paying excessive recordkeeping fees, at least to the extent that they aren't credited with the excess. What is more likely is that participants who exit the Plan subsidized the participants remaining in the Plan, as there is no record available that demonstrates that Swiss Re sent a payment equivalent to the R5 credit to those Plan participants who left the Plan before the rebate was paid. There is, therefore, a plausible recordkeeping claim on its face, and dismissal is, therefore, inappropriate.

---

[13] $877,273 in the spending account, divided by the Plan's 4,288 participants.

Last, because the Plaintiffs adequately allege that the Plan paid excessive recordkeeping fees and that Empower breached its duties to the Plan (see the Plaintiffs' concurrently filed memorandum in opposition to Empower's motion to dismiss), they've adequately alleged their derivative cross-selling claim against Swiss Re. Swiss Re failed to consider the revenue generated by Empower from their improper cross-selling activities and therefore failed to leverage that income into a better recordkeeping deal for Plan participants. As a result, it failed to create administrative savings by properly acting as a fiduciary on behalf of Plan participants.

## IV.    The Plaintiffs adequately plead their imprudent investment options claims (Count II)

The Plaintiffs allege that Swiss Re selected and retained investment options that underperformed compared to their comparators and that had excessively high expense ratios. Plan participants do not have information related to a fiduciaries decision-making process when it comes to fund selection and maintenance. *Sacerdote*, 9 F.4th at 107; *St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719-720 (2d Cir. 2013); *Braden*, 588 F.3d at 598 ("No matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences"). Although ERISA imposes disclosure requirements that are supposed to give plan beneficiaries "the opportunity to find out how the fiduciary invested in the plan's assets," *St. Vincent*, 712 F.3d at 720, the reality is that the required disclosures say nothing about a fiduciary's decision-making process. For example, below are 27 documents that must be disclosed to participants,[14] none of which shed light on how a fiduciary selected or retained investment options:

- o **Summary Plan Description (SPD)** – Informs participants of their rights, benefits, and obligations under the plan.

- o **Summary of Material Modification (SMM)** – Describes any material

---

[14] *Reporting and Disclosure Guide for Employee Benefit Plans*, U.S. Dept. of Labor (Sept. 2017), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/reporting-and-disclosure-guide-for-employee-benefit-plans.pdf (accessed August 20, 2025); *Retirement Plans Reporting and Disclosure Requirements*, Internal Revenue Service (https://www.irs.gov/pub/irs-pdf/p5411.pdf (accessed August 20, 2025).

modification to a plan and to the information required in the plan's SPD.

o **Summary Annual Report (SAR)** - Provides a "narrative summary" of the plan's annual Form 5500.

o **Notification of Benefit Determination** – Provides information regarding determinations of any benefit claim made by the participant.

o **Plan Document** – Upon request, the plan administrator must make the Plan available to the participant.

o **Notice of Blackout Period for Individual Account Plans** – Notice that a participant's account is temporarily suspended, limited, or restricted under an individual account plan.

o **Qualified Default Investment Alternative Notice** – Provides advance notice describing how contributions will be invested on the participant's behalf if no investment is otherwise selected.

o **Automatic Contribution Notice** – Informs participants of their rights and obligations related to an automatic contribution arrangement.

o **Annual Funding Notice**- Contains "basic information" about the status and financial condition of the plan.

o **Participant Plan and Investment Fee Disclosures (for self-directed plans)**– inapplicable to individuals invested in the QDIA.

o **Form 5500** – Provides aggregate information on a plan's qualification, financial condition, and operation.

o **Form 5588**– Application for extension of time to file Form 5500.

o **Form 1099-R**– Reports participant distributions of $10 or more.

o **Notice of Effective Opportunity to Make or Change Cash or Deferred Election** – Advises plan participants of the opportunity to make or change a salary deferral election.

o **401(k) Safe Harbor Notice** – Advises eligible employees of their rights and obligations under the plan, including safe harbor information.

o **Qualified Automatic Contribution Arrangement (QACA) Notice** – Advises eligible employees of their rights and obligations related to qualified automatic contribution arrangements.

- o **Eligible Automatic Contribution Arrangement (EACA) Notice** - Advises eligible employees of their rights and obligations related to eligible automatic contribution arrangements.

- o **Interested Party Notice** – Notifies participants if the plan pays or otherwise benefits an interested party (as defined under ERISA).

- o **401(k) Safe Harbor Discontinuance Notice** – Notifies eligible employees of the consequences of an amendment during a plan year that reduces or suspends safe harbor matching contributions.

- o **Updated Notice for Mid-Year Changes to Safe Harbor Plans or Safe Harbor Notices** – Provides and updated safe harbor notice that describes a mid-year change and its effective date.

- o **Eligible Rollover Distribution Notice (§ 402(f) Notice)** – Describes the tax treatment and withholding rules related to rollover distributions.

- o **Explanation of Income Tax Withholding Requirements** – Informs participants that they need not have federal income tax withheld from their distributions.

- o **Explanation of Automatic Rollover** – Provides notice that, absent affirmative action by the participant, the participant's payments will automatically be rolled over to an IRA.

- o **Consent to Distribution Explanation** – Obtains the participant's consent to a distribution over $5,000.

- o **Notice of Right to Diversify Investments in Employer Securities** – Provides applicable individuals with the right to divest employer securities in their account and reinvest those amounts in certain diversified investments.

- o **Domestic Relations Order and Qualified Domestic Relations Order Notices** – Notifies the participant of the plan's procedure for determining the qualified status of a domestic relations order.

- o **Notice of Suspension of Benefit Upon Reemployment of Retiree** – Explains why a participant's benefits payments are being suspended.

The Plan Service Provider Disclosure, which is provided to plan fiduciaries, has detailed information about the compensation, both direct and indirect, that Plan service providers will

receive for providing services to pension plans. This disclosure is not provided to participants, as they are not fiduciaries. As such, the one document that would provide pertinent information—the plan service provider agreement—is not disclosed outside of litigation, and even then, likely under the cloak of a confidentiality agreement.

When a plaintiff can't provide direct proof of imprudent decision-making methodologies, it must allege only circumstantial evidence. The Court must construe this evidence in light most favorable to the Plaintiffs. *Sacerdote*, 9 F.4th at 106-107 (citations omitted). In doing so, the Plaintiffs ask the Court to consider that even small differences in returns will drastically impact a Plan participant's account balance by retirement age because of the effect of compounding. The Plaintiffs also ask the Court to read their imprudence claims in the aggregate: Swiss Re has made many imprudent investment decisions, and those imprudent decisions, taken together, constitute a breach of its fiduciary duties to the Plaintiffs.

The Plaintiffs have selected adequate comparators for the court to conclude that Swiss Re's investment selection was imprudent. Morningstar's filter system creates an "apples-to-apples" comparison of funds with respect to risk, return, and behavior profiles. Compl. ¶ 89. Any protest that Swiss Re may have about the comparator funds is a question of fact unsuitable for resolution on a motion to dismiss. *Silva v. Evonki Corp.*, 2020 WL 12574912, *6 (D.N.J. Dec. 30, 2020)(*quoting Nicolas v. Trustees of Princeton Inv.*, 2017 WL 4455897, at *5 (D.N.J. Sept. 25, 2017)); *see Chill v. Calamos Advisors LLC*, 175 F. Supp.3d 138 (S.D.N.Y. 2016).

The Plan's JPM R5 TDFs underperformed virtually all of its comparators between 2018 and 2023, even in the years in which they performed in the top 50% of funds in their Morningstar categories. Compl. ¶ 149-150. The funds were in the bottom half nearly half the time. *Id.* Swiss Re argues that underperformance was nominal, but the reality is that even "nominal" underperformance results in significantly less money in a participant's account when he or she retires.[15]

---

[15] While Swiss re takes the time to criticize the benchmarks utilized by the Plaintiffs, it does nothing to explain its own methodologies for selecting investment options. The same holds true of its assertion that fund performance cannot

ERISA's fiduciary standard doesn't require merely being better than average half the time. It requires acting solely in the interest of plan participants. A viable investment selection and monitoring process would have resulted in the replacement of the JMP R5 TDFs for funds that would maximize returns for Plan participants. *Id.* ¶¶ 150, 155, 160-161. The Plaintiffs alleged that Swiss Re lacked a proper methodology and consequently breached its duties. That's all that's required at this stage. The Court in *In re Omnicom ERISA Litig.* stated:

> But the overwhelming trend with district courts in this Circuit is to defer deciding the question of whether two funds are proper comparators until after discovery. *See, e.g., Cunningham v. Cornell Univ.*, No. 16-cv-6525 (PKC), 2017 WL 4358769, at *7 (S.D.N.Y. Sept. 29, 2017) (noting that whether two funds were proper comparators raised "factual questions that are not properly addressed on a motion to dismiss"); *Sacerdote v. N.Y. Univ.*, No. 16-cv-6284 (KBF), 2017 WL 3701482, at *10 (S.D.N.Y. Aug. 25, 2017) (declining to address defendant's argument that plaintiffs used "patently inappropriate benchmarks" because it "raises factual questions that are not appropriately addressed" at the motion-to-dismiss stage). Deciding whether defendants have breached their fiduciary duty – the ultimate issue in an ERISA case – requires considering whether the overall *process* of decision making was up to standard. The allegations of the complaint raise questions such as *why* Omnicom preferred the Active Suite over the Index Suite, and likely requires a deeper dive into each Suite's investment strategy, prospectus, and industry reputation. These are issues that require factual development and are not properly considered at the motion-to-dismiss stage.

2021 WL 3292487, at *13 (S.D.N.Y. 2021).

In addition to underperformance, the JPM R5 TDFs carry expense ratios that are much higher than readily available, equal alternatives. In the JPM family, Swiss Re could have chosen the cheaper R6 share class, which consists of the same investments but has a lower expense ratio.

Swiss Re claims that the R5 share class is cheaper than the R6 when factoring in its revenue credit. ECF No. 67. However, that argument is misleading. While the R5 may be "net cheaper"

---

be judged in a vacuum. Swiss Re propounded no defense of its fund selection; instead, it wastes time discussing courts' rejections of 3- and 5-year underperformance lookbacks. The argument is meritless, considering that the Plaintiffs provided proof of the funds' underperformance over ten years. Compl. ¶ 90.

than the R6 after the credit's applied, this doesn't address the questions around timing of the revenue credit disbursements (see *supra* at 11). It also doesn't address the issue of Plaintiffs' loss of returns. "Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016)(internal quotations and citations omitted); *see Vellali v. Yale Univ.*, 2022 WL 13684612, at *13 (D. Conn. Oct. 21, 2022)(*citing Sacerdote*, 9 F.4th at 112)(loss is measured by a comparison of what a plan actually earned with what it would have earned had the funds been available for other purposes). Here, Plaintiffs' damages between 2018 and 2023 total $1,253,076. Compl. ¶ 141. Swiss Re is liable to them for at least this amount. *Trustees of Upstate N.Y. Engr's Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016)("If, but for the breach, the [Plan] would have earned even more than it actually earned, there is a loss for which the breaching fiduciary is liable").

Had Swiss Re properly filtered and reviewed its investment options using a system like Morningstar, it never would have retained the JPM R5 TDFs and would have opted for the R6 versions or a non-JPM fund altogether. However, because it doesn't employ proper methods for determining which funds to keep and remove, its decisions cost the Plaintiffs and the Plan millions of dollars that participants could have used during retirement. The likelier scenarios are either:

- o that when Empower purchased JPMorgan's recordkeeping service in 2014, it simply chose to keep the JPM R5 TDFs on the Plan's menu, since they'd been there since at least 2008. Exhibits 1 and 2;[16] or

- o that Swiss Re chose the R5 because it could use the revenue credit to pay Plan expenses, rather than its forfeiture account money (see *infra* at 18-19).

Either scenario constitutes a breach of its fiduciary duty.

---

[16] The Court can take judicial notice of these documents. *American Stores*, 170 F.3d at 1270 (*citing* Fed. R. Evid. 102(b).

V.    **The Plaintiffs adequately allege their forfeiture accounts claims (Count III).**

Unvested employer contributions go to the Plan's forfeiture account when a participant leaves the Plan. Compl. ¶ 162. The Plan Document states that forfeitures "**shall** be **used** to reduce Company Matching Contributions, Annual Company Contributions, Pension Transaction Contributions, Profit Sharing Contributions, QNECs or QMACs, restore forfeitures pursuant to subsection (c) below or to pay reasonable administrative expenses." ECF No. 68-9 at 34 (emphasis added). The mandative "shall" directs fiduciaries to use forfeiture funds in their entireties for these purposes. In addition, it elucidates the Plan's intent for the plan sponsor to use the entirety of the forfeiture account. *Id.* at 35. Specifically, the Plan states, [t]o the extent such current forfeitures are inadequate to restore the forfeited accounts of affected participants…" *Id.* If accumulating and amassing forfeiture account balances was contemplated, there would be no need to include verbiage about a forfeiture account shortage.

Swiss Re failed to fully utilize the forfeiture account. Rather than use its forfeiture funds, it chose to hoard them. In 2023, its forfeiture account balance was $640,606, a $117,109 increase from 2022 and a nearly half-million dollar increase from 2018. Compl. ¶ 167. This accumulation violates Swiss Re's duty to Plan participants, namely, to act solely in their best interests.

In addition, from 2018-2023, Swiss Re spent $7.6 million to reduce its future employer contributions. It spent only $2,625 over that period to pay Plan expenses, and that happened only once, in 2022.[17] This saved Swiss Re millions of dollars at the expense of the Plan and Plan participants, who were forced to incur avoidable expense deductions. A prudent fiduciary would have engaged in an impartial decision-making process to determine how to use the forfeiture account funds, including whether to select the R5 share class to cover Plan expenses. It's choice to self-deal violates ERISA. *Becerra v. Bank of Am. Corp.*, No. 3:24-cv-921-MOC-DCK

---

[17] Because Swiss Re chose the JPM R5 TDFs, Plan expenses were covered by the funds' revenue credits, at the expense of Participants' returns.

(W.D.N.C. Aug. 12, 2025); *Rodriguez v. Intuit Inc.*, 744 F. Supp.3d 935, 945 (N.D. Cal. Aug. 12, 2024). The Plaintiffs are, therefore, entitled to redress.

The Plaintiffs respectfully ask this Court to review the totality of the circumstances in determining whether the Complaint survives Swiss Re's motion to dismiss, and thereby critically examine Swiss Re's (in)action in:

- o its use of the Plan's forfeiture funds;

- o its allowing Plan participants to pay high recordkeeping and administration fees;

- o its "set-it-and-forget-it" methodology when it chose and retained the Plan's investment options; and

- o its failure to monitor Empower's activities.

## VI.    This Court should grant the Plaintiffs leave to file an amended complaint if it finds any of their claims deficient.

Should the Court find the Complaint deficient, the Plaintiffs respectfully request leave to amend it. Leave to amend a complaint should be freely given. Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962); see also *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872 (5th Cir. 2000)(quoting *Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. Am. Co.*, 195 F.3d 765, 770 (5th Cir. 1999))("Unless there is a "substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial.")).

Swiss Re cites *DigitAlb, Sh.a v. Setplex*, LLC, 284 F. Supp. 3d 547, 556-57 (S.D.N.Y. 2018) and this Court's rules for the proposition that the Complaint should be dismissed with prejudice. ECF No. 67 at 4. However, that case is distinguishable because, here, the Court did not hold a preliminary conference and therefore the Plaintiffs have not "already had an opportunity to replead after specific warnings as to [the Complaint's] deficiencies. *DigitAlb*, 284 F. Supp. at 556-667. In addition, Swiss Re's reference to *Harris v. Swiss Re Am. Holding Corp.*, No. 1:22-cv-07059-ALC (S.D.N.Y.) doesn't justify dismissal with prejudice. This case deals with an entirely different set of plaintiffs and contains different factual allegations.

Finally, Swiss Re will not be prejudiced by the amendment because discovery has not yet begun.

## CONCLUSION

For those reasons, the Plaintiffs respectfully ask this Court to deny Swiss Re's motion to dismiss or, alternatively, to allow the Plaintiffs to amend their Complaint.

Date:  August 22, 2025                Respectfully submitted,
       New York, NY

                                      **Sedhom Law Group, PLLC**

                                      By: _Rania V. Sedhom_ _____
                                      Rania V. Sedhom, Esq. (RS5439)
                                      Danielle M. Peterford (6006506)
                                      630 Fifth Avenue, Suite 2508
                                      New York, NY 10111
                                      212-664-1600 (o)
                                      212-563-9280 (f)
                                      rsedhom@bespokelawfirm.com
                                      dpeterford@bespokelawfirm.com
                                      *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on August 22, 2025, the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

By: ____*/s/ Danielle M. Peterford*_____
      Danielle M. Peterford, Esq.

### LOCAL RULE 7.1(C) CERTIFICATION

I certify that the foregoing memorandum complies with the word count limits set forth in in Rule 7.1(c) of the Local Rules of the United States District Court for the Southern District of New York, and contains 6,935 words, exclusive of the caption, table of contents, table of authorities, signature blocks, certificate of service, and this certificate.


By: ___*/s/ Danielle M. Peterford*_____
         Danielle M. Peterford, Esq.